**HAWAIIAN TUNA PACKERS, Limited, v. INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION (C. I. O.) et al.**

Civ. 779.

District Court, Hawaii.

July 15, 1947.

Anderson, Wrenn & Jenks and Smith, Wild, Beebe & Cades, all of Honolulu, Hawaii, for plaintiff.

Harriet Bouslog and Myer C. Symonds, both of Honolulu, Hawaii, for defendants.

## McLAUGHLIN, Judge.

This is a suit under the anti-trust laws for treble damages and injunctive relief brought by the Hawaiian Tuna Packers, Limited, against the International Longshoremen's and Warehousemen's Union (C.I.O.), its Local 150 and numerous named and unnamed individual defendants. 15 U.S.C.A. §§ 1, 3, 15 and 26. 28 U.S.C.A. § 41(23) confers jurisdiction upon this Court.

Between March 17, 1947, and May 15 the parties sparred about arguing extensively over a motion to dismiss and filing several memoranda in connection therewith. Then when the case stood submitted, plaintiff filed an amended complaint against which on June 16 the defendants filed a new motion to dismiss, which was argued June 24.

Upon the facts alleged plaintiff claims an injurious violation of the Sherman Act, asserting that by joining with "some employers" under the rule of the Allen Bradley case, Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, the defendants have lost their immunization to suit. On the contrary, the defendants in general assert that they are immune from suit for various reasons and place major emphasis upon the statement that the facts alleged reveal a "labor dispute" within the meaning of the Norris LaGuardia Act, 29 U.S.C.A. § 101 et seq.

The essential facts pleaded are that:

1. The plaintiff, as its name implies, basically cans tuna fish and is the only tuna cannery in the Territory. It does not itself engage in fishing, but had under contract ten of the thirteen Oahu tuna boatowners, the obligation of the contract being that the boatowners would deliver fresh tuna and other fish caught by their boats, except 600 pounds per week, to the plaintiff. It was then plaintiff's obligation to sell the fresh fish upon the local Oahu market as agent for the boatowner, for which it received a 10% commission, and then to purchase the unsold or surplus fish on its own account for canning purposes. The price paid by plaintiff for the surplus fish was determined with reference to the price of similar fish upon the mainland United States. The contract required the boatowners to man their boats with competent crews and to fish diligently the year around. Plaintiff's canned tuna sold in interstate and territorial commerce.

2. The boatowners engage crews, and in some instances the owner also serves as a member of the crew.

3. As to fishing boats not under contract to plaintiff, plaintiff as the only tuna cannery hereabouts has been able to purchase the surplus tuna caught by such boats.

4. During 1946 "substantial members of the crews of the 13 fishing boats and some of the owners" of said boats were organized into a fishing unit of the I.L.W.U. as its Local 150 by Jack Hall, Robert McElrath, Ralph Tokunaga and Ernest Arena acting together and with others alleged to be unknown "but including the owners of said tuna fishing boats." Since its organization Local 150 is said to the date of suit to include substantial members of the crew of these 13 boats and also some of the owners thereof.

5. After Local 150 was organized and around January 24, 1947, the defendants, it is charged, agreed among themselves, with and including some boatowner members of Local 150, to enter and did enter into a combination and conspiracy to restrain and control trade and commerce in the Territory in the sale of fresh tuna and other fish caught by the boats and to fix the price at which said fish shall be sold, to wit, at not less than 20¢ per pound for aku and 35¢ per pound for other varieties, and thus to give the defendant I.L.W.U. and its Local 150 and its officers and members a monopoly

of said trade and commerce, all contrary, it is said, to the anti-trust laws of the United States.

6. On January 24, 1947, the defendants, acting and speaking through Jack Hall and Ernest Arena, demanded of plaintiff that it contract with Local 150 that for one year fish caught by said tuna boats would be sold to and purchased by plaintiff at the fixed price of 20¢ per pound for aku and 35¢ per pound for other fresh fish. And as persuasive, defendants advised plaintiff that under such a contract plaintiff should become a fishing monopoly and could hence resell at whatever price it pleased, or can the fish. Plaintiff refused to so contract with Local 150.

7. On January 27 Local 150 wrote plaintiff, restating the contract proposal and saying that "We understand from our conversation * * * that you do not desire to consider further our proposal. Accordingly, by secret referendum ballot, the crews of the following fishing vessels now supplying your cannery have determined that they will withhold their labor power and cease fishing because you leave them no alternative." Ten fishing boats—the ten whose owners were under contract to plaintiff— were then listed in the letter. Plaintiff refused to accede to the written proposal.

8. On or about January 27, 1947, a strike or work stoppage was commenced by the crews of the ten tuna boats whose owners were under contract to plaintiff. It is charged that this strike or work stoppage was brought about by the I.L.W.U., Local 150, Jack Hall, Robert McElrath, Ralph Tokunaga, and Ernest Arena acting in concert and with others, including owners of tuna boats who were members of Local 150. On February 17 plaintiff and four of the ten boatowners under contract cancelled their contracts by mutual agreement.

9. Said strike or work stoppage continues (as of the date of the original complaint), except that those boatowners under contract which have fished have not delivered their catches to plaintiff, as thereby required. The union officials, it is charged, have instructed crewmembers and boatowners not to deliver fish to plaintiff, and plaintiff's inability to obtain fish caught by boats operating from Oahu has been brought about by defendants because plaintiff would not contract with Local 150 as it proposed.

10. Coercion, intimidation and threats are alleged to have been made by defendants against crewmembers and boatowners in order to prevent them from fishing if the fish caught was to be delivered to plaintiff. Like acts are alleged upon the part of defendants to prevent boatowners from obtaining nonunion crewmembers.

11. As part of this strike or work stoppage defendant Local 150 set up a picket line in front of plaintiff's cannery.

12. On February 23, 1947, two Hilo tuna boats under contract to plaintiff delivered their surplus fresh fish to plaintiff. The following day representatives of Local 150 went to Hilo and, it is alleged, threatened the crews of these two boats that if they or others sent surplus fish to plaintiff, defendant Local 150 would send Oahu tuna boats to Hilo with catches sufficient to disorganize the Hilo fresh fish market then enjoyed by the Hilo fishing boats only. Because of this threat it is charged that the Hilo boatowners and crews agreed with Local 150 to limit their catches to meet only the demands of the Hilo fresh fish market; and consequently plaintiff is precluded from obtaining fresh fish under its contract and otherwise from this source, all pursuant to the alleged conspiracy and for the purpose of allowing defendants to restrain trade and commerce on fresh fish sales and to give defendants a monopoly so that they can artificially fix the price of fresh fish.

13. As a result of the foregoing it is charged that defendants' unlawful combination and conspiracy is successful, gives defendants a monopoly in restraint of trade, allows defendants to artificially fix the price of fresh fish, and denies plaintiff fresh fish to such an extent that it has no fresh fish to sell upon the local market, no fish to can, and has thus been forced to suspend cannery operations, which in turn reduces the amount of canned tuna sold and available for sale in Hawaii and continental United States.

14. The alleged unlawful combination and conspiracy by defendants is said not to

be exempt from the anti-trust laws by either the Clayton Act or the Norris LaGuardia Act and is said to have injured plaintiff's business in ways spelled out but not here repeated, being obvious from the foregoing recitals, except that it is also alleged that plaintiff's marine railway department for construction and repair of small vessels has also suffered a loss because boatowners feared that if they patronized plaintiff's marine railway department that that department might be called out on strike in support of the strike or work stoppage of the tuna boats. The total alleged damage is said to be $25,000, and it is further alleged that if the situation obtains indefinitely, plaintiff's valuable cannery business will be destroyed.

Upon a second count, plaintiff, realleging the essentials, states that in addition:

a. Unless defendants are enjoined, the 1947 summer season for canning tuna will have passed and plaintiff will have been prevented by defendants' unlawful acts from buying fresh tuna to can, to its irreparable injury and ultimate destruction.

b. And that it does not have in this situation an adequate remedy at law.

Based upon these allegations, plaintiff prays for:

1. Triple damages, costs and attorneys' fees.

2. A permanent detailed injunction against defendants because of their alleged unlawful combination and conspiracy in restraint of trade and commerce.

3. A preliminary injunction of like nature pending final decree, and

4. Such other relief as is meet and just.

 Against this motion the well pleaded facts must of course be accepted as true. And save and except for the bearing thereon of the Clayton Act and the Norris LaGuardia Act, which will be dealt with hereinafter, I am satisfied that upon the basis of the case United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, the plaintiff has satisfactorily spelled out a case under the anti-trust laws, as a combination or conspiracy to fix prices is an unreasonable restraint of trade and commerce in violation of the Sherman Anti-Trust Act.

Was the Sherman Act ever meant to apply to labor unions, and if so have amendments—the Clayton Act and the Norris LaGuardia Act—exempted unions from its scope?

 The argument that the Sherman Act was never intended to apply to labor unions is historically interesting. See "The Sherman Act and Labor Disputes" by Louis B. Boudin, 39 Col.Law Review 1283 and 40 Col.Law Review 14, and by the same author "Organized Labor and the Clayton Act," 29 Va.Law Review 272 and 29 Va.Law Review 395. But however sound, the record shows that it was not judicially accepted and for that reason the Clayton and Norris LaGuardia Acts came to pass. To date, even in the face of those two amendments and the decision in the case of United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, which says that the Sherman Act, the Clayton Act, and the Norris LaGuardia Act must all be read together as an integrated whole, the Supreme Court still affirms that under certain conditions the Sherman Act may be applicable to labor unions. Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

 Being bound by the decisions of the Supreme Court and not free to remake history, the problem here is considerably reduced in size. And the question becomes: Have the defendants lost their immunization under the Clayton and Norris LaGuardia Acts and become exposed to the application of the Sherman Act?

Today's answer to this question is to be found by applying under the decision in the Hutcheson case, supra, the Sherman, Clayton and Norris LaGuardia Acts as an integrated whole in the light of subsequent Supreme Court decisions. Thus our concern is not what the law used to be, or should have been, but actually what it is now as most recently revealed by the Supreme Court in its Allen Bradley decision, supra, and its decision in Hunt v. Crumboch, 325 U.S. 821, 824, 65 S.Ct. 1545, 89 L.Ed. 1954, and Apex Hosiery Co. v. Lead-

er, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

In the light of these decisions it seems to me that the problem presented, to state it differently, has become: Is this a case which can be said to "involve or grow out of a labor dispute," Sections 52 (Clayton Act) and 113 (Norris LaGuardia Act) of 29 U.S.C.A.? And if it is, by joining with "some employers" has the defendants' statutory protection been lost under the Allen Bradley decision?

In my opinion the alleged facts do not state a case which can be said to "involve or grow out of a labor dispute" any more than similar facts did not in the case of Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750. The facts here to be sure are different and distinguishable from those in the Hinton case, yet they are similar in that the dispute is about the price of fish, not terms or conditions of employment nor representation. While it is now beside the point in a labor dispute that the parties do not stand in relation to one another as employer and employee, 29 U.S.C.A. § 113(c)—as these parties do not—nevertheless the immunization against judicial interference for cause is conditioned upon the existence of a labor dispute over "terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment * * *." Here no dispute as to the terms and conditions of employment exists upon the alleged facts between the crewmembers of the tuna boats and their employer, the boatowners. This is solely a dispute over the price of fish, as was the fact also in the Hinton case concerning which the Supreme Court said, 315 U.S. at pages 145-147, 62 S.Ct. at page 521, 86 L. Ed. 750:

"* * * This definition and the stated public policy of the Act —aid to 'the individual unorganized worker * * * commonly helpless * * * to obtain acceptable terms and conditions of employment' and protection of the worker 'from the interference, restraint, or coercion of employers of labor' * * * make it clear that the attention of Congress was focussed upon disputes affecting the employer-employee relationship, and that the Act was not intended to have application to disputes over the sale of commodities.

"We recognize that by the terms of the statute there may be a 'labor dispute' where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification, however broad, of parties and circumstances to which a 'labor dispute' may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing. Our decisions in New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012, and Milk Wagon Drivers' Union v. Lake Valley Farm Products Co., 311 U.S. 91, 61 S. Ct. 122, 85 L.Ed. 63, give no support to the respondents' contrary contention, for in both cases the employer-employee relationship was the matrix of the controversy.

"The controversy here is altogether between fish sellers and fish buyers. The sellers are not employees of the petitioners or of any other employer, nor do they seek to be. On the contrary, their desire is to continue to operate as independent businessmen, free from such controls as an employer might exercise. That some of the fishermen have a small number of employees of their own, who are also members of the Union, does not alter the situation. For, the dispute here, relating solely to the sale of fish, does not place in controversy the wages or hours, or other terms and conditions of employment, of these employees."

Defendants argued that since fishermen's —crewmen's—wages are dependent upon the price at which the boatowner sells the catch, the crewmen who share in the proceeds cannot possibly get an increase in wages unless the price of fish is raised, therefore this is a "labor dispute" relating to fishermen's wages.

 This is nothing but specious reasoning. In the first place the facts do not reveal that the crewmen are negotiating the subject of wages or percentage shares of the proceeds with the boatowners by whom

they are employed, and further it just is not so that the only way crewmembers could get increased wages would be to effect an increase in the price of fish. Defendants overlook the position of the boatowner and adjustments and absorptions he might make to increase wages without affecting the price of fish. Upon the alleged facts the decision of the Hinton case is controlling. This is not a case involving or growing out of a "labor dispute."

■ But assuming that it is—that our dissimilar facts take the case out of the holding of the Hinton case—then, as I see it, the allegations that the union and its members have combined with "some employers" to achieve the objective of establishing a monopoly in order to artificially fix the price of fresh fish causes the case to fall within the ruling of the Allen Bradley case, supra. That is, that so long as the union does not join forces with others— non-labor groups—to effect its purpose, it is safe from interference for cause by the federal courts. As put by the Supreme Court in the Allen Bradley case, 325 U.S. 797, at page 810, 65 S.Ct. 1533, at page 1540, 89 L.Ed. 1939:

"Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups. * * *"

And in the Hutcheson case, 312 U.S. 219, at page 232, 61 S.Ct. 463; at page 466, 85 L.Ed. 788:

"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

But it is said by defendants that these boatowners to which plaintiff has reference are also fishermen. That is some of the "some boatowners" are owners who fish as members of the crew, receive shares of the proceeds as crewmen, as well as retain the owner's share. That may be, and it may upon trial develop that they are in Local 150 as crewmen or fishermen rather than in their capacity as boatowners. But at the moment all that is known is what is alleged, namely that union crewmembers have combined with some of their employers to effect their purpose. Such an allegation as against the motion must be taken as true and it brings the case within the Allen Bradley decision.

■ Defendants also argue that plaintiff does not come to court with "clean hands." The argument is that prior to canceling four of its ten contracts with boatowners on February 17, plaintiff was itself a monopoly—and is still a monopoly in that it has the only cannery in Hawaii and the price it pays for surplus fresh fish is a "fixed price" as it is determined by reference to mainland prices for similar fish. This contention is upon the pleading under consideration without foundation. The fact that plaintiff may be a monopoly does not excuse others from violating the Sherman Act.

■ Finally as a ground of the motion, defendants say that the suit is not maintainable because the Sherman Act is inapplicable to fishermen organized as a co-operative marketing agency under the provisions of 15 U.S.C.A. § 521 et seq. Assuming the applicability of this statute to Hawaii, the defense is upon the facts alleged in the complaint without merit, for nowhere therein does it appear that the defendants have organized themselves under this law for the purpose of marketing their aquatic products in interstate and foreign commerce. Indeed, it is alleged that the fishermen work for the boatowners, not for themselves, hence it is doubtful that the fishermen could organize a cooperative while in this status. Further, if a cooperative did exist here, as it is clear from United States v. Borden Co., 308 U.S. 188, at page 204, 60 S.Ct. 182, 84 L.Ed. 181, that cooperatives are not exempt from the Sherman Act when its members unite with others to violate the anti-trust laws, the pivotal fact alleged that the defendants joined forces with "some employers" in contravention of the Sherman Act would deprive the defendants if they were a cooperative of the protection otherwise available under 15 U.S.C.A. §§ 521 and 522.

568

For the reasons above recited, I find the complaint to state a cause of action under the Sherman Act from which upon the facts alleged the defendants are not immunized by any law of the United States.

The motion to dismiss is denied.