GULF COAST SHRIMPERS AND OYS-TERMANS ASSOCIATION, Louis S. Simmons, Leon Strong and Walter Mc-Veay, Appellants,

v.

UNITED STATES of America, Appellee.

No. 15680.

United States Court of Appeals Fifth Circuit.

Sept. 6, 1956.

Albert Sidney Johnston, Jr., Howard A. McDonnell, Biloxi, Miss., C. Paul Barker, New Orleans, La., for appellants.

Earl E. Pollock, Daniel M. Friedman, Attys., Dept. of Justice, Washington, D. C., Robert E. Hauberg, U. S. Atty., Jackson, Miss., George R. Blue, U. S. Atty., New Orleans, La., Stanley N. Barnes, Asst. Atty. Gen., Henry M. Stuckey, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from judgments of conviction entered upon jury verdicts finding appellants guilty of engaging in a combination or conspiracy in restraint of trade or commerce in violation of the Sherman Anti-Trust Act.[1] The errors specified and argued relate mainly to the sufficiency of the indictment, the adequacy of the court's oral charge, the refusal of the court to give certain written instructions requested by the appellants, and the overall sufficiency of the proof to support the verdict.

---

[1]. 15 U.S.C.A. § 1 provides in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The appellant Association is a corporation organized under the laws of Mississippi, with headquarters at Biloxi and affiliated branches at Pascagoula, Bay St. Louis, Gulfport and Pass Christian. During the 1950–1953 period here material, appellant Simmons was President of the Association, and appellant McVeay was Secretary of the Pascagoula branch.[2]

The evidence shows that practically all commercial shrimp and oyster fishermen operating from the aforementioned Mississippi ports were members of the appellant Association. Upon stipulated conditions, Association membership was extended to both fishing boat captains and crew members.[3] Association members were permitted to sell their catches to about twenty-two shrimp and oyster packers and canners at various locations along the Mississippi coast, and practically all of the shrimp and oysters packed by these companies were shipped in interstate commerce. All packers and canners were required by Association rules to purchase every catch tendered by Association fishermen, to furnish free ice for the fishermen to prevent spoilage, and to pack both shrimp and oysters.

The majority of the smaller boats used were owned by individual fishermen-members of the Association, but most of the larger boats were owned by the packers or "dealers". An Association rule purported to require the dealers to purchase fishing licenses for all boats, whether owned by them or by the fishermen, though the proof shows that a number of fishermen-members of the Association owning their own boats purchased their own licenses.[4] The boats used by the fishermen-members fall into three separate classifications: (1) those both owned and licensed by the dealers; (2) those boats owned by the fishermen, but

licensed by the dealer; and (3) those boats both owned and licensed by the individual fishermen. Fishermen who operated boats in the first classification were generally required to sell their catches to the dealer who owned the boat, except in emergency instances when it became necessary during a voyage to sell and deliver the catch to some other dealer's "freight boat" to prevent spoilage. Fishermen who operated boats in the second classification generally sold their catches to the dealer who purchased their boat license, but there was no compelling obligation for them to do so if other dealers were offering a higher price. Of course, fishermen who operated boats which were both individually owned and licensed could dispose of their catches to whatever dealer they desired.

The captains of the boats were selected by the dealers, and the captains generally had the right to select and hire or fire their crew members. The boat captains were in actual charge of the fishing operations after the vessels left port, and the dealers had no right to direct them as to when and where to fish, though the dealers could specify the type fish to be caught, usually shrimp, and the locations to which the catches should be returned. There is some defensive testimony that the dealers, through their failure either to permit use of their boats, or, in some instances, to agree to purchase the catch of boats owned and operated individually by the fishermen, could at any time effectively terminate the services of any particular captain and his crew members with whose work they were dissatisfied.

The proceeds of each catch were ordinarily divided between the fishermen and dealers according to the "Mississippi system of sharing", which system required

<hr>

2. Two other officers of the Association, Fred Costello and Leon Strong, were also included as defendants in the indictment, but the district court discharged Costello for insufficiency of the evidence to implicate him in the alleged conspiracy, and though the defendant Strong was convicted, he died during the pendency of his appeal.

3. The jury was authorized to find that the Association limits membership to residents of the Gulf States area for a period of two years or more.

4. About 100 of the 445 licenses issued by the Mississippi Seafood Commission for the operation of shrimp and oyster boats during 1952 were granted to individual Association members.

that the fuel and grocery expenses for each trip first be deducted from the value of the entire catch, after which equal shares were received by the boat owner, the boat captain, and each member of the crew. In those instances where the boat's "rig" [5] was not paid for, an additional and equal share was also first allocated to discharge this indebtedness. If the catch was small and its value did not exceed the expenses incurred, the fishermen received nothing and were still responsible for repayment of any expenses advanced, though further testimony shows that certain dealers would "carry over" these unpaid expenses until other trips were made where the catches were sufficient to cover the expenses already accrued from a prior, unsuccessful trip. As to dealer owned or licensed boats, some of the dealers admitted their payment of state severance taxes levied upon shrimp and oysters caught under this arrangement; that they further withheld and paid income tax of fishermen, based upon the fishermen's share of each catch, and deducted social security taxes and unemployment insurance contributions from the value of the fishermen's share for transmittal to the federal and state taxing authorities.

The proof adduced by the Government in support of its indictment allegations that appellants had conspired to fix and maintain prices shows that, whatever the type boat used, all Association fishermen were prohibited from selling shrimp or oysters below the prices set by the Association; that member-captains operating dealer-owned "freight boats" were also prohibited from buying at below Association prices; that neither the fishermen-members nor the dealers were permitted to buy shrimp or oysters from any fisherman who was not a member in good standing with the Association; and that any member who sold his catch below Association prices was subject to a fine, suspension from membership, and forfeiture of the proceeds from the sale of his catch. Other Government proof shows that, to insure dealer compliance with its pricing policies, the appellant Association either authorized or ratified mass member picketing, designed to prevent nonmember or out-of-state fishermen from fishing in Mississippi waters or selling to Mississippi coast packers; boycotting of nonconforming dealers by Association members; and coercion of nonmember fishermen to join the Association and comply with its price schedules.[6]

The Association President, appellant Simmons, in his statement prepared for grand jury presentation, captioned "The Way the Prices Are Fixed", reported that up until 1952 the membership of the Association met as a body to discuss prices; that after a price was fixed the Association officers were instructed to notify the dealers that such price would be demanded; that, subsequently, the Association adopted a faster and less cumbersome method of determining prices through an Association "price control committee", consisting of nine member-fishermen authorized to raise or lower the price according to the season and the way the catch was running; and that the dealers did not participate in the discussions and deliberations of the price control committee. A seriously contested issue at the trial was whether raw shrimp and oyster prices were arbitrarily fixed by this "price control committee" without the consent of the dealer-packers, or whether they were arrived at through mutual bargaining and negotiation between the Association and its members on the one hand, and the dealer-packers on the other. Though appellant Simmons at the trial re-affirmed his prior grand jury statement that the dealers

---

5. The rig would include the boat nets, tackle and other gear required either to trawl for shrimp or dredge for oysters.

6. An instance of violence and forceful intimidation of nonconforming dealers and nonmember fishermen occurred during the Pascagoula disturbance in July, 1951, when several hundred fishermen-members of the Association participated in picketing of the Pascagoula docks and in forceful prevention of an attempt by out-of-state fishermen to sell their shrimp catches to local packers.

did not participate in the determinations of the "price control committee", his overall testimony along with other defensive proof tends to show that a number of dealers did, upon invitation, attend committee meetings to contest the prices there agreed upon and demanded of them by the committee, especially when an increase in the prices of raw shrimp and oysters was sought; and in a number of instances actually initiated meetings of the price control committee to obtain a price reduction when prevailing local prices were higher than those paid by packers elsewhere with whom the dealers felt they could not successfully compete. However, a number of packers testified for the Government that they either were not invited to attend the meetings, or that at such meetings they had no effective means of blocking the price determinations of the committee, their only alternative being either to pay the prices fixed by it or suspend their packing operations.

I. Sufficiency of the Indictment.

Appellants first insist that certain allegations of the indictment render it fatally insufficient to charge any offense under the Sherman Act.[7] They argue that the indictment allegation of the Association's incorporation under Mississippi law by necessary reference restricts the objects and purposes of the Association to those of a "labor group", as supposedly revealed by its corporate charter;[8] that Sections 6 and 20 of the Clayton Act and Section 7 of the Norris-La Guardia Act insulate such labor organization activity from Sherman Act liability;[9] and that the indictment is further defective in charging a conspiracy with "other persons * * * unknown", instead of specifically alleging that such other parties were non-labor groups, which allegation appellants urge is essential to state an offense against them under the Sherman Act. For reasons hereinafter stated, we think each of these contentions as to the insufficiency of the indictment is unsound.

First, the Association's corporate charter, while relevant to show the "objects and purposes" for which it was formed, cannot exonerate it from liability for proven violations of a Federal statute, whether the complained of activity of the Association and its agents was ultra vires or not. Unless we are to elevate form above substance, the controlling consideration is whether the proof reveals the activity complained of as violative of the Act, not whether a particular group's asserted privileged status forbids its prosecution. See United States v. American Tobacco Co., 221 U.S. 106, 180, 181, 31 S.Ct. 632, 55 L.Ed. 663; Local 36 of International Fishermen & Allied Workers of America v. United States, 9 Cir., 177 F.2d 320, 336, Note 25. In any event, a labor group is not immune from Sherman Act liability if the

---

**7.** Particularly under attack are the allegations of the Association's incorporation under Mississippi law; the averment that the Association membership is composed of "independent businessmen engaged in business on their own account"; that "no employer-employee relationship exists between the fishermen and the dealers to whom the catch is sold"; and that defendants joined with "other persons to the Grand Jurors unknown" in carrying out the conspiracy alleged.

**8.** The "objects and purposes" clause of the Association's charter provides:
"The purpose for which it (Association) is created: To work together for the improvement and betterment of ourselves and our community; To have a

legally constituted and authorized medium, by and through which we may better take up and discuss with those for whom we work the matter of securing better prices for our catches, and better working conditions for ourselves and our co-workers. And to obtain for us every reasonable and just advantage in connection with our service, and to create and foster a better understanding as between all who work at the occupation of fishing and all those engaged in the buying and canning or shipping of such seafoods as we might bring to them for sale."

**9.** See United States v. Hutcheson, 312 U.S. 219, 231–234, 61 S.Ct. 463, 85 L. Ed. 788; 15 U.S.C.A. § 17; 29 U.S.C.A. § 52; 29 U.S.C.A. § 107.

proof, as distinguished from the indictment allegations, shows that it has combined with non-labor groups to effect an unlawful restraint upon trade and commerce. Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 798, 810, 65 S.Ct. 1533, 89 L.Ed. 1939. Thus, if we assume appellants' asserted status as a labor organization, in spite of the indictment allegation that its membership is composed of "independent businessmen", the indictment here was not fatally defective in failing expressly to negative the possibility of the testimony revealing that those other unknown persons with whom appellants allegedly conspired were non-labor groups. Where, as here, an exemption from liability is not set forth in the statute defining the offense, it is not essential for the indictment to negative the possibility of the existence of such exemption. See McKelvey v. United States, 260 U.S. 353, 357, 43 S.Ct. 132, 67 L.Ed. 301. That is strictly a matter of proof.

## II. The Court's Charge.

■ Appellants' main attack upon the court's oral charge is its failure to present clearly for jury determination the determinative factual issue of whether the fishermen-members of the Association were joint adventurers or employees of the dealers.[10]

At appellants' request, the court instructed the jury as follows:

"The Court instructs the Jury for the Defendants that labor unions have the legal right to bargain collectively and are exempt from the provisions of the Sherman Anti-Trust Act, provided that they do not engage in a conspiracy to unlawfully and unreasonably restrain trade. Therefore, if you find from the evidence, or lack of evidence, that the Defendants are a labor union, consisting of laborers and employees and that their negotiations with the dealers did not consist of price-fixing, as alleged in the indictment, then it is your sworn duty to return a verdict of Not Guilty."

Appellants insist, however, that the instruction given was incomplete and insufficient to inform the jury of the substance of their main defense; i. e., that, if the fishermen were found to be employees of the dealers, appellants were not guilty as a matter of law. They accordingly urge reversible error for the court's failure to present this issue more succinctly, as set forth in several of their other requested charges which the court refused.[11]

■■ We think there was no reversible error in the court's oral charge, or in its refusal to give the instructions requested. While portions of the testimony might have justified a clearer submission of the factual issue of whether the captains and crew members operating the dealer-owned boats were employees of those particular dealers, we think it clear from this record that the

---

10. On this issue the district court concluded in the jury's absence as follows:

"I am of the opinion that the operation of the fishing boats is one of joint adventure. It is a matter for the Court to determine whether the relationship of master and servant exists, or joint adventure. If it was a relationship of master and servant or employer and employee, they would be entitled to a directed verdict. I fail to see any element of employer and employee in the case. The controlling elements in the case, I think, show definitely and conclusively that the transactions had between these parties, and as testified to by all the witnesses, is one of joint adventure."

11. For example, appellants' instruction No. 24, refused by the court, reads as follows:

"It is one of the contentions of the Defendants in this case that in essence they are workers, or laborers, selling their services and the use of their vessels and equipment, as fishermen, at wages to be determined at so many cents per pound for shrimp and oysters.

"If you should find as a fact that they are such type of workers, being compensated as mentioned, then I instruct you that no law of the United States prevents them from agreeing among themselves to set a price on shrimp and oysters, and you must therefore find them 'Not Guilty'."

error in this respect, if any, was harmless, for certainly the court might well have instructed the jury, as a matter of law, that the substantial number of the Association's member-fishermen who owned, operated and licensed their own boats were not employees subject to control of the dealers.[12] Moreover, since a labor organization's exemption from liability under the Sherman Act is restricted to activity occurring in a "labor dispute", and it is highly debatable whether such a "labor dispute" within the meaning of Section 13 of the Norirs-La Guardia Act, 29 U.S.C.A. § 113, here existed,[13] the instructions given were at least as favorable, if not more favorable, than those to which appellants were entitled.

■ Appellants further insist, though not too confidently, that the district court erred in refusing to submit to the jury the question of whether the actual activities of the Association and its members were within legal objectives permitted by Sec. 1 of the Fishermen's Collective Marketing Act, 15 U.S.C.A. § 521.[14]

12. It is not entirely clear from the record what number or percentage of dealers who withheld income and social security taxes of the fishermen were dealers owning their own boats, and what percentage withheld from fishermen operating individually owned and licensed boats. A report of the Gulfport, Mississippi, Social Security Administration Office, revealing a determination that the services of one Oscar T. Chinn, a fishing boat captain for the Biloxi Canning & Packing Co., constituted "employment" within the meaning of Sec. 210 of the Social Security Act [42 U.S.C.A. § 410], is, therefore, not controlling here, since that report reveals that Chinn was operating a large, company-owned vessel, and does not preclude a finding from this record that the fishermen who owned and operated their own boats were not employees of their dealers. In any event, no principle of res judicata or estoppel operates to bar the Government from maintaining this Sherman Act prosecution merely because one of its welfare agencies makes a determination from undisclosed testimony seemingly contra to the Government's instant claim that a controlling percentage of these fishermen were not employees, but were "independent businessmen" or joint venturers with the dealers for whom they operated. The public may not be deprived of the protection of a statute because of the action or inaction of officials of a government administrative agency. See Pennsylvania Water & Power Co. v. Federal Power Commission, 74 App.D.C. 351, 123 F.2d 155, 162; N. L. R. B. v. Baltimore Transit Co., 1 Cir., 140 F.2d 51, 54–55; McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 176 F.2d 633, 641.

13. See Columbia River Packers Association, Inc., v. Hinton, 315 U.S. 143, 146–147, 62 S.Ct. 520, 86 L.Ed. 750; Local 36 of International Fishermen, etc. v. United States, 9 Cir., 177 F.2d 320, 330, certiorari denied 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361; Hawaiian Tuna Packers v. International Longshoremen's & Warehousemen's Union, D.C., 72 F. Supp. 562, 566.

14. "§ 521. *Fishing industry; associations authorized; aquatic products defined; marketing agencies; requirements*

"Persons engaged in the fishery industry, as fishermen, catching, collecting, or cultivating aquatic products, or as planters of aquatic products on public or private beds, may act together in associations, corporate or otherwise, with or without capital stock, in collectively catching, producing, preparing for market, processing, handling, and marketing in interstate and foreign commerce, such products of said persons so engaged.

"The term 'aquatic products' includes all commercial products of aquatic life in both fresh and salt water, as carried on in the several States, the District of Columbia, the several Territories of the United States, the insular possessions, or other places under the jurisdiction of the United States.

"Such associations may have marketing agencies in common, and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however*, That such associations are operated for the mutual benefit of the members thereof, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein; or

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

"and in any case to the following:

"Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

The Association did not act as a marketing agency for its members, except in the fixing of the prices to be paid for shrimp and oysters. The members sold their catches directly to the dealers. In its price-fixing, the Association exceeded any possible privilege or exemption granted by the Fishermen's Collective Marketing Act when it undertook not simply to fix the prices demanded by its members, but to exclude from the market all persons not buying and selling in accordance with its fixed prices. Local 36 of International Fishermen, etc. v. United States, 9 Cir., 177 F.2d 320, 332; Manaka v. Monterey Sardine Industries, Inc., D.C.N.D.Cal., 41 F.Supp. 531; Cf. United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

III. Sufficiency of the Evidence to Show Appellants' Price Fixing and Illegal Restraint.

 Much of the testimony has already been summarized relative to appellants' price-fixing rules and policies, and the coercive methods and practices by means of which these policies were implemented through fines against nonconforming Association members, dealer boycotts, picketing, forceful prevention of nonmember and out-of-state fishermen from operating from Mississippi ports or selling to Mississippi packers, and coercion of them to join the Association in order to force compliance with its price schedules. While our emphasis and reliance upon this testimony is intended merely as illustrative, rather than exhaustive of the voluminous record testimony supporting the verdict, we think that such testimony, coupled with several significant admissions contained in appellant Simmons' grand jury statement [15] and testimony of the deceased appellant Strong,[16] was sufficient to present a jury question as to whether appellants engaged in that form of unlawful price-fixing and restraint of interstate trade proscribed by the Sherman Act. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311; Allen Bradley Co. v. Local No. 3, 325 U.S. 797, 798, 810, 65 S.Ct. 1533, 89 L.Ed. 1939; Local 36 of International Fishermen, etc. v. United States, 9 Cir., 177 F.2d 320, 330, certiorari denied 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361; Hawaiian Tuna Packers v. International Longshoremen's and Warehousemen's Union, D.C.Hawaii, 72 F.Supp. 562, 567.

The judgment is accordingly

Affirmed.

15. For example, Simmons' admission that, "The dealers do not participate in any way in the discussions and deliberations of this (price control) committee," and his further admission that, "We do try to prevent boats manned by fishermen who are not members of our union from coming into our dealers and dumping their catch on our dealers, underselling our men and running our fishermen off."

16. With reference to the Pascagoula disturbance in July, 1951, at which picketing by several hundred Association mem-

bers and some violence occurred, Strong conceded in his testimony that, "The members did it and I guess we were responsible for it, sure." Other testimony shows that the Association paid for food for the members who engaged in the picketing and even took some disciplinary action against those who were supposed to participate and did not. The Association also paid for appellant Simmons' transportation from Biloxi, Mississippi, to Pascagoula on the morning of the disturbance.