WILLIAMS PACKING & NAVIGATION CO., Inc.,

v.

J. L. ENOCHS, District Director of Internal Revenue.

Civ. A. No. 2690.

United States District Court S. D. Mississippi, Jackson Division.

July 3, 1959.

Stanford E. Morse, Sr., W. E. Logan, Gulfport, Miss., for plaintiff.

Clarence J. Nickman and Stanley F. Krysa, Attys., Dept. of Justice, Washington, D. C., Robert E. Hauberg, U. S. Atty., and Edwin R. Holmes, Jr., Asst. U. S. Atty., Jackson, Miss., for defendant.

MIZE, District Judge.

This is a controversy between the Williams Packing & Navigation Co., Inc., and J. L. Enochs, District Director of the Internal Revenue and arises as a result of a determination of the Commissioner of Internal Revenue that the persons upon whose compensation the taxes involved were assessed were employees of the plaintiff within the meaning of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. An assessment was made by the director against the plaintiff for the years 1953, 1954 and 1955 in the total sum of $41,568.57. The main question posed for solution is whether or not the captains and crewmen who performed fishing services aboard trawlers of which the plaintiff was the owner or the lessee, were employees within the meaning of Sections 1426 and 1607 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 1426, 1607, and Sections 3121 and 3306 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 3121, 3306. If the relationship of employer-employee existed, then the tax was properly assessed. If the relationship of employer-employee did not exist, then the levy was unlawful.

The corporation leases boats to a captain who employs his own crew and each captain has complete control over the boat and crew and no right of control is reserved by the corporation. The captain and crew determine when they shall depart for fishing waters and where to go. The catch is returned and sold, and the proceeds are divided up by the captain after one share is deducted for the boat.

This case, like so many other cases, depends upon the individual facts as brought out here and not upon methods of other similar concerns engaged in like business. No uniform pattern covering the entire United States can be formulated except where the facts are identically the same. The judgment to be rendered in this case must be determined from the facts of this particular case, including all the exhibits and reasonable inferences therefrom and the conduct of the parties so far as it may have probative force upon the issues. The law must be determined from the Acts of Congress, the judicial interpretations by the courts and the Treasury Regulations insofar as the Treasury Regulations are made within the scope of the powers granted to it by Congress.

The record is a lengthy one and there are some conflicts in the testimony, but on the whole the testimony is practically undisputed as to the manner in which the plaintiff conducts its business. The plaintiff, Williams Packing & Navigation Co., Inc., is a Louisiana corporation and was organized in June of 1944 and granted a charter by the State of Louisiana and is qualified to do business in Mississippi. Elmer Williams, Carroll Williams, Jr., and Lucius Frieberger, citizens of Mississippi, were the incorporators, with Elmer Williams, president, owning nineteen shares, Carroll Williams, Jr., secretary-treasurer, nineteen shares, and Lucius Frieberger two shares. The purpose of the corporation was to engage in the seafood packing business, to own, operate, lease, manage and control boats, machinery, appliances and tackle for the purpose of engaging in the fishing operations, fishing for, dredging and catching oysters, shrimp, crabs and other species of fish.

It has operated under its charter continuously from year to year since the date of its incorporation and is a bona fide

corporation existing under the laws of the State of Louisiana. It was not organized for the purpose of evading the payment of any taxes of any type and at the time of its incorporation, as well as now and continuously since its incorporation, was to engage in a legitimate business, which it has done. If it were to operate for oysters in the waters of the State of Louisiana it was necessary and imperative that it incorporate in that state, insofar as oysters were concerned. Other than catching shrimp, oysters and other fish in the State of Louisiana, its principal place of business is at Biloxi, Mississippi. In the conduct of its business it leased the greater part of the time from the DeJean Packing Company, a partnership, some eighteen or twenty shrimp trawlers, and in March, 1952 bought from the DeJean Packing Company two additional fishing vessels which were built by the DeJean Shipyard Company in Biloxi. These two vessels were resold in 1957 to the DeJean Packing Company.

Elmer Williams, the president of the corporation, is the General Manager, including business manager and looking after the details of carrying on the work, particularly within the past few years. Carroll Williams, Jr., at the time of the trial of the lawsuit, was in bad health and had been for several years, but participated in the discussions frequently with Elmer as to the methods of carrying on the business. Lucius Frieberger was and is the bookkeeper and attends to the major part of the office details of the business. A fairly accurate set of books is kept on behalf of the corporation, but because of the nature of the business not such a set of books as could be characterized as a full and complete set of records. Among other things that Frieberger keeps is an account of the trip expenses for each boat and the catch made by each boat. He handles the financing and banking details of the corporation, issues the checks to the captains of the boats after having computed how much is due for a catch and turns the check over to the captain, who cashes it and pays off the men employed by the captain to assist him in the operation of the boat.

It has been the custom on the Coast of Mississippi since the seafood packing industry started that fishing vessels have operated upon a share or lay basis, but the details of this customary way varied between some of the packers and that is the reason that it is necessary to determine how the corporation in this particular case conducted its business.

This corporation retained no control over the captain or his men after a vessel had been let to a captain upon his application for a boat or to one selected by Elmer Williams and picked by him to operate the boat. There was no fixed time usually for which a boat would be let to a captain. Occasionally it would be for a trip, but usually and customarily for a season. Elmer Williams, the president, the record shows, knew practically all of the fishermen along the Coast of Mississippi and knew the capable and competent ones to whom he safely could entrust a boat owned by the corporation or leased by it and they would reach an agreement by which the boat would be let to the captain for either trips or for the season. The corporation, acting through Elmer Williams, reserved no right of control over the captain, but leased or let the boat to the captain with the distinct understanding that the captain would hire all of his men or helpers and could fire them without any right whatsoever on the part of the corporation to hire or fire any of the employees of the captain. The transaction partook very much of the nature of a contract. The corporation could not fire the captain, but if the captain were guilty of a breach of a contract, just as in any other contractual relationship, the inference is from the testimony that the corporation could then require the captain to return the boat because of a breach of contract, but not because of any retained right of control over the captain.

When the captain takes possession of the boat he takes the papers to the office of the Bureau of Customs, where he ob-

tains the necessary statutory endorsement on the papers as captain of that boat. Then it is that the captain employs the number of fishermen necessary to complete the crew as may be determined by the captain; in the industry here on the Coast the crew is usually two for shrimping and four for dredging oysters. A voyage may last from ten days to two weeks, depending upon the weather and the type of seafood for which they are looking. The boat and crew are then completely under the supervision and control of the captain, who leaves port when he desires, fishes where he pleases and returns when he pleases. The captain procures the fuel, groceries and ice, and determines for himself the amount that will be needed for his voyage. The captain may purchase his fuel and groceries wherever he desires, but usually purchases his fuel at the DeJean docks and his groceries at the grocery store of Leon Hall. Leon Hall is the son-in-law of Elmer Williams and operates successfully a grocery store.

The testimony shows that the captains of these boats purchased a great part of their groceries during the years involved from Leon Hall, but not because he is a son-in-law of Elmer Williams; it is because of his efficiency and accommodation in delivering groceries to the boats, rather than having the captain and crew go to a grocery store to purchase their own groceries and make delivery themselves. Leon Hall charges groceries to the account of the boat captain or to the boat, makes deliveries, and if he does not have the groceries in his own store, will send out and get them. He is conveniently located to the boats and it easily can be seen why the captains patronize a store of this type. Their patronage is not due to any coercion whatsoever upon the part of Elmer Williams or of the corporation. The captains usually obtain their equipment from the DeJean Packing Company and their ice from the Biloxi Freezing Company. The ice blocks, which are delivered to the docks for loading, are reduced to size for boat use by an ice crusher located at the De-

Jean docks. Elmer Williams is a partner in the DeJean Packing Company and is vice-president and a stockholder in the Biloxi Freezing Company and, while an uneducated man, yet he is a successful business man, very energetic and accommodating. It is because of the convenience and accommodation that the captains of the various boats have in this set-up that they patronize these other industries or businesses in which Elmer Williams is interested. It is not because of any reserved control, right of control or coercion on the part of the corporation or Elmer Williams.

As hereinabove stated, the purpose and business of the corporation is to catch and sell seafoods with boats either owned by them or leased by them. The captains usually sell their output or catch to the DeJean Packing Company, but there is no requirement that they so do. They are at liberty, if they can get a better price than offered by DeJean, to sell their catch when and where they please. When one of these boats comes in with a catch it usually docks at the DeJean docks where the catch is sold, and if sold to DeJean, the catch is unloaded on a conveyor system at the docks and on this conveyor system ultimately is weighed and then moved into the processing operations of DeJean Packing Company, DeJean Packing Company being engaged in the processing of seafood. A record is made of the weight of the catch, given to the captain, who takes it to Lucius Frieberger, who totals up and calculates the amount of money the catch represents. Frieberger adds up the trip expenses, including the fuel, groceries and ice, etc., and then these expenses are deducted from the value of the gross catch and the net cash is divided between the captain and his crew, one share going to each, one share going to the boat (generally known as the boat share), and one share goes for the rig until the rig is paid for. The check is made payable to the captain, who makes the distribution.

There is another feature shown by the record to the effect that if a trip is un-

successful it is generally called a broker, and means that no catch was made where the value of the catch is sufficient to cover the cost of the trip. Under these circumstances the unpaid cost of the trip is carried forward to succeeding trips to be deducted from subsequent catches before any subsequent disbursements are made to the fishermen on these subsequent catches. It occurs occasionally under these circumstances that the corporation may advance money to the fishermen out of its own general fund with the expectation of being repaid. This is no requirement by the terms of the contract, but simply a gratuity on the part of the corporation, I would say, in order to maintain the good will of the fishermen. If one of the fishermen on such a broker is not employed again by a captain, then the corporation simply loses that amount of money.

 The defendant introduced in evidence certain hospital records of the Marine Hospital at New Orleans, which contained statements made by the corporation against interest, and possibly it brought out other statements against interest. Likewise, the plaintiff points to the conduct of the Government in indicting the Fishermen's Union, charging that they were not employees, and in that case, in the prosecution of the indictment, contended and urged that the fishermen were not employees. These statements against interest are admissible in evidence and competent to the issues, and in this case were considered by the court along with all the other evidence in reaching a judgment herein. However, statements against interest made by a party are not conclusive, but are only to be considered as a part of the evidence, along with all the other facts in the case, and after so being considered, it is then the duty of the court to determine the actual facts. See 31 C.J.S. Evidence §§ 377, 378 and 379, pp. 1161 to 1164.

 The investigation of the Internal Revenue Service was commenced in March, 1956 and on July 17, 1956 formal notice was given to the corporation and demand made for the payment of the taxes. On September 5, 1957, the corporation filed this suit seeking permanently to enjoin the collection of the tax on the ground that it was illegally assessed and that to be required to pay that large amount of money would wreck and ruin the corporation, and were such unusual circumstances because of its illegality and the inability of the corporation to pay, that an injunction was warranted, notwithstanding Section 7421(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7421(a), which provides that no injunction shall issue restraining the assessment or collection of a tax. As a matter of law, it is a rare case where an injunction will issue, but where the tax is illegal and there exists some unusual and extraordinary circumstance, then it is appropriate to grant injunctive relief. The corporation has always assumed that it was not liable for taxes of this nature for the reason that the relationship of employer and employee did not exist, and prior thereto no contention by the Government had been made to it. It alleged that being suddenly called upon to pay $41,568.57 was more than it could do. I find as a fact that if the levy had been made upon the assets of the corporation it would have wrecked the corporation and thrown it into bankruptcy, as it did not have and does not have assets with which to pay the taxes and not sufficient assets with which it could have negotiated a loan to pay the tax.

 It was the theory, and is the theory, of the Government that the DeJean Packing Company is able to pay the tax and that because of the relationship of Elmer Williams to the corporation and to the partnership that the corporation had it within its power to require the DeJean Packing Company to pay the tax for it if the corporation be liable. However, as heretofore stated, this contention is not sustained by the evidence. The record clearly shows that the DeJean Packing Company is completely a separate and independent entity from that of the corporation and the DeJean Packing

Company is under no duty or requirement of law to pay the tax for the corporation. It is a partnership composed of Elmer Williams and his wife, and Carroll Williams and his wife.

The corporation is engaged only in production of raw materials and sells practically all of its product to the De-Jean Packing Company. At the time of the filing of the suit it owned two vessels worth approximately twenty-one or twenty-two thousand dollars, and its only assets of any value were the leasehold interest it had upon boats and the good will and value of its right to fish in the waters of Louisiana. The balance sheet of the corporation shortly before the suit was filed showed that it had a deficit of approximately $300, and the record shows that from time to time there were overdrafts and on other occasions where it had a fairly good bank account, but not sufficient to pay the sum of $41,568.57 in a lump sum, and, as before stated, if the Government had been permitted to execute upon the property and seize and sell it, it would totally wreck and ruin the corporation. The corporation is entitled to continue its existence because its charter has value and gives it valuable rights in Louisiana, and as long as it complies with all the federal laws it should not be permitted to be destroyed.

■ The burden of proof, of course, is upon the corporation to show that it was an unusual hardship to be required to pay an illegal tax, and in this case it has so shown by the burden of proof that to pay the illegal tax would put it out of business.

■ The Government complains of bad faith on the part of the plaintiff and concealment of evidence. The court finds as a fact that the plaintiff was not guilty of any bad faith or any intentional concealment of any records or evidence. The record does show that some of the documents requested by the Government and ordered to be furnished by the court were not delivered within the time directed by the court, but it was due to the inability of the plaintiff to locate these documents —not to intentional conduct on the part of the plaintiff—and when they were located they were furnished to the defendant and the court gave the defendant ample opportunity for full examination of all documents they desired to look at.

■ I find as a fact that the relationship of employer and employee as defined by the Social Security Act, 42 U.S.C.A. § 301 et seq., did not exist and does not exist between the corporation and the captains of the boats and the crewmen, and that the tax was illegally and unlawfully levied, and that to have permitted the director to proceed to levy upon the property of the corporation would have destroyed the business of the corporation and completely wrecked it and worked an unusual and extraordinary hardship upon the corporation, and under these circumstances the temporary injunction was properly issued and should be permanent.

Counsel for plaintiff and defendant have filed elaborate briefs, which have been very helpful to the court and which have cited many authorities, but it will not be necessary to refer to each particular authority cited by the respective parties and to do so would unduly prolong this opinion.

■ The law is well settled that if a tax has been levied and demanded that is illegal and the alleged taxpayer cannot pay it without undue hardship and that the circumstances are unusual, he then is entitled to an injunction. See Midwest Haulers v. Brady, 6 Cir., 128 F.2d 496; John M. Hirst & Co. v. Gentsch, 6 Cir., 133 F.2d 247. It is well settled that under ordinary circumstances an injunction will not issue, but that an alleged taxpayer who disputes the liability of the tax must pay it and sue for recovery of it. This principle needs no citation nor authority. Likewise, hardship placed upon an alleged taxpayer does not justify the issuance of an injunction. See Reams v. Vrooman-Fehn Printing Co., 6 Cir., 140 F.2d 237. On the other hand, where it is shown that the tax is illegal and

that there are exceptional and extraordinary circumstances, then it is appropriate to grant an injunction. See Miller v. Standard Nut Margarine Co., 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422; United States v. Curd, 5 Cir., 257 F.2d 347. See also United States Mutual Benefit Ass'n v. Welch, 6 Cir., 268 F.2d 201.

I therefore conclude as a matter of law that it was appropriate to grant the temporary injunction.

Having found as a fact that the relationship of employer-employee did not exist, it is not necessary to determine what the relationship of the parties really is, but apparently, insofar as the corporation and the captains are concerned, it is the relationship of lessor and lessee or joint adventurers, as was claimed by the Government in the Gulf Coast Shrimpers and Oystermans Association v. United States, 5 Cir., 236 F.2d 658, or that of independent contractors. The crewmen were employed by the captain, or joint adventurers with him. It is not necessary to discuss all the authorities that have been cited by the plaintiff and the defendant touching upon the relationship of the parties. It is sufficient to cite the cases of Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947; United States v. Silk (Harrison v. Greyvan Lines), 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757; and Gulf Coast Shrimpers and Oystermans Association v. United States, 5 Cir., 236 F.2d 658, and the authorities that were cited by the court in these decisions.

I shall not undertake to differentiate all the cases cited by the defendant and relied upon by him, but simply call attention to the fact that each particular case is governed by its own facts. The case of Maryland Casualty Co. v. Grant, 39 Ga.App. 285, 146 S.E. 792, a Georgia case, is easily distinguishable from the facts in the instant case. To a certain point the facts are the same, but at the crucial point the facts are different. In that case the canning company reserved the right to fire the captain operating the boat at any time it desired and without cause, and giving a liberal construc-

tion to the Workmen's Compensation Act of Georgia, the court held that the captain was an employee of the canning company rather than an independent contractor. Southern Shell Fish Company v. Plaisance, 5 Cir., 196 F.2d 312, is a case wherein the court held that it was properly submitted to the jury to determine an issue of fact as to whether the plaintiff in that case was an employee of the Southern Shell Fish Company or of the vessel's captain as an independent contractor of the vessel, and that the record showed that there was evidence that would support either theory. In that case there also was an additional circumstance of insurance coverage, which is a circumstance to be taken into consideration in determining whether the relationship of employer-employee exists or that of an independent contractor. See Finkbine Lumber Co. v. Cunningham, 101 Miss. 292, 57 So. 916.

These examples of the authorities simply illustrate the point that each case will be determined by the facts of the particular case and that no general pattern can be established or formulated. The record in the Gulf Coast Shrimpers and Oystermans Association case, supra, well demonstrates that fact and the fact that all the packers on the Coast of Mississippi do not have identical patterns. In that case it was shown by one of the packers that he paid Social Security on his employees and retained sufficient control over the operations of the captains as would make them employees. On the whole, however, as shown in that case, the relationship of employer-employee does not exist and it was so contended by the Government in the case. While the Government is not estopped by taking a contrary position, yet the contention of the Government at that time is very persuasive, and the judgment of the court and the opinion of the Supreme Court denying certiorari establishes that the relationship of employer-employee did not exist. The court, during the trial, declined to submit the issue to the jury and in the absence of the jury agreed with the contention of the Government

and found as a fact that the relationship of employer-employee did not exist and stated that if it did exist, then the defendants would be entitled to a directed verdict, but declined and refused instructions requested by the defendants to submit it to the jury. This action of the trial court was affirmed.

 It is not necessary to give the history of the present act of Congress, but suffice it to say that the act as it finally came out of the Congress defined an employee to mean "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". It is, therefore, clear that Congress adopted the definition of an employee to be that as understood under the common law realistically applied, in determining whether the relationship of employer-employee existed. The various cases construing the act prior to 1948 were discussed in the report of Senator Milliken from the committee on finance, and Congress finally adopted the definition above quoted.

Applying the common-law rule, it is clear in this case as a matter of law that the relationship of employer-employee does not exist between a corporation engaged in the business that the plaintiff is and the captains of the boats as shown in this particular record. No one criterion can be announced that will define and determine that relationship, but the right of control is one of the important elements. In determining what the common law is, the decisions of the federal courts rather than of the various states must be looked to in order to determine what it is. Treasury Regulation 107, Sec. 403.2045 recognized this doctrine. The Treasury Regulations have the force of law where they are within the perimeter of the Acts of Congress. If they exceed the authority granted by Congress, then, of course, they are without weight.

The defendant in this case contends that the corporation in this case is a sham and a shell and that its corporate existence and charter may be entirely disregarded, and cites the case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. Under the facts of the present case those authorities are not applicable, but, on the other hand, the facts of the present case bring it within the doctrine of Moline Properties v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, and as announced in that case the corporation is one that was organized for a legitimate purpose and authorized by applicable law.

I conclude as a matter of law that the tax was illegally assessed and that the granting of the injunction was appropriate and that the injunction should be made perpetual.

An order may be drawn in accord herewith.