**COLONIAL STORES INCORPORATED,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 30198.**

United States Court of Appeals,
Fifth Circuit.

Oct. 22, 1971.

---

Ernest P. Rogers, George B. Haley, Jr., G. Kimbrough Taylor, Jr., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for petitioner.

Joseph Martin, Jr., Harold D. Rhynedance, Jr., Asst. Gen. Counsel, J. B. Truly, Miles J. Brown, Attys., FTC, Washington, D. C., for respondent.

Before JOHN R. BROWN, Chief Judge, COLEMAN and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Vividly illustrating the increasingly complex character of the retail grocery trade, this appeal also incorporates such diverse elements as a Walt Disney movie, frozen shrimp, canned beef stew and, most significantly, allegations of price discrimination under § 2(d) of the Robinson-Patman Act, 15 U.S.C.A. § 13(d).[1] The impetus for our consideration of this amalgam of entertainment, cuisine and trade regulation law is provided by the Federal Trade Commission's determination that petitioner Colonial Stores, Inc. (Colonial) had practiced an unfair method of competition in commerce[2] by inducing from its suppliers discriminatory advertising allowances that Colonial knew or should have known had not been offered to its competitors on proportionally equal terms. We affirm and enforce in its entirety the order of the Commission.

Background: Colonial Falls On Its "Sword"

Colonial is a large, well-established retail grocery chain operating approximately 430 stores in nine States[3] with annual sales in the half-billion dollar range. Its activities are divided on a geographical basis into six operating divisions, each of which is supervised by a vice president and a general manager, and most of the buying and merchandising decisions originate at the division level. Within its own trade area the division is more or less autonomous, maintaining a warehouse and keeping separate records regarding purchases, sales, advertising and promotional activities.

Traditionally Colonial has promoted sales of its products in a number of different ways, including direct mail, radio and television advertising and in-store display of particular items. It has also utilized periodically so-called "special event promotions," in which a variety of advertising and merchandising techniques are devoted to a particular theme derived either from the season (for example, Thanksgiving or Christmas) or from elaborately planned contests involving games or prizes. In addition to soliciting suppliers to participate in these promotions, selecting the themes, and establishing the time period for which they are to run, Colonial also dictates the terms for the events and determines the rate to be paid by suppliers in return for promotional assistance.

Early in 1964 Colonial initiated a promotion based on the Walt Disney motion picture "Sword in the Stone," a feature-length cartoon then being shown throughout the United States. The film's release was accompanied by a nationwide saturation advertising campaign in-

---

1. "It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

2. Section 5(a) (1) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a) (1), provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." Indisputably a § 2(d) violation is per se a violation of § 5(a) (1). F.T.C. v. J. Weingarten, Inc., 5 Cir., 1964, 336 F.2d 687, 693, n. 16, cert. denied, 1965, 380 U.S. 908, 85 S.Ct. 890, 13 L.Ed.2d 796.

3. Colonial's trade area includes Georgia, Florida, Alabama, North Carolina, South Carolina, Virginia, Maryland, Kentucky and Ohio.

itiated by its producers, and Colonial sought to capitalize on this extensive publicity by purchasing from a professional supermarket game promoter a packaged promotional campaign [4] built around a "Sword in the Stone" theme and employing, among other things,[5] color brochure advertising of its suppliers' products. Although each division utilized a slightly different format, in general each brochure contained approximately fourteen pages of 8 x 5-inch four-color advertising space, and altogether several million of them were mailed to customers in Colonial's nine-State trade area. Not all suppliers purchased space in this mailer but instead participated in other promotional arrangements involving either in-store displays or cooperative mass media advertising.[6]

Colonial sold to its suppliers—that is, persuaded them to purchase—brochure advertising space for a variety of well-known products, including Coca-Cola, Alcoa aluminum foil and Gordon's potato chips. Only two participants in the promotion are relevant for present purposes: Tradewinds Company, a supplier of seafood products which were ordinarily sold through Colonial retail stores, and Poss' Famous Foods, Inc., producers of a line of canned meat items.[7] During the first three months of 1964 Tradewinds paid a total of $7700 for brochure advertising of its breaded frozen shrimp in four Colonial division mailers, while Poss paid $1700 for the advertising of its Brunswick stew in the Columbia division mailer and for the display of its products in Colonial's stores during the first two weeks of 1965. The Hearing Examiner found, and the Commission agreed, that the promotional consideration paid by each of these suppliers was discriminatory because proportionally equal offers had not been made to Colonial's competitors.

### The Commission's Findings

With respect to Tradewinds, the evidence establishes that during 1964 it maintained with Colonial a regular cooperative advertising program under which Colonial received a 1% advertising allowance on all purchases of Tradewinds products. Tradewinds also gave to Colonial periodic off-invoice discounts on particular items in return for promotional consideration. There is no dispute that both of these arrangements were offered to all of Colonial's competitors and were not discriminatory.

However, the FTC found that the payments received by Colonial's Atlanta Division in connection with the Sword in the Stone promotion were in addition to, rather than part of, the regular advertising allowances and that they were

4. The "Sword in the Stone" game, purchased by Colonial from Famous Character Promotions, Inc., was developed with the assistance of Walt Disney Productions and involved a printed paper card representing a "Stone" attached to another card symbolizing a "Sword," which when withdrawn by the customer revealed one of the four words in the title of the movie. If the customer collected cards spelling the title she presented them to Colonial in return for a cash award of $100. Some of the cards were imprinted with the names of particular products, which were then awarded to the customer as free prizes. Colonial acquired rights to the game on an exclusive basis and co-sponsored it with the manufacturer of "Melmac" plastic dinnerware as part of a joint promotional effort.

5. In addition to each advertising brochure and game card, Colonial's mailer included offers of other premiums, including coupons and free childrens' rings.

6. There is no evidence of any sort in the record even remotely suggesting that Colonial attempted to coerce any of its suppliers into participation in the "Sword" promotion, and we assume that all suppliers who took part did so on a strictly voluntary basis.

7. Although the original complaint named eight suppliers as having discriminated in favor of Colonial, the Hearing Examiner concluded that the evidence established discrimination only with respect to the payments by Tradewinds and Poss. The Commission's final cease and desist order therefore must stand or fall on the basis of the findings respecting these two producers.

therefore unlawful because at least three of Colonial's competitors had not been offered similar payments.[8] This finding was grounded mainly on the fact that, in order for the $2400 payment to fall within the 1% allowance, Colonial would have had to purchase more than a quarter of a million dollars' worth of Tradewinds products during the first quarter of 1964, although the sales invoices reflected purchases during that period totaling only $33,553.80. Concluding that the "Sword" payments were in addition to the regular advertising allowance, and that equivalent payments had neither been offered nor made to at least some of Colonial's competitors, the Commission held that the promotional consideration paid was discriminatory and that Colonial knew or should have known of that fact.

With respect to Poss, the record reveals that its general manager testified that the company's standing policy was to offer all customers free goods in return for promotional consideration, in addition to an alternative advertising plan operated on a bill-back basis. However, Poss' records also showed that during 1964 the value of free goods and allowances offered to the trade generally under its usual programs was grossly disproportionate to the value of the payments made to Colonial for the Sword in the Stone promotion.[9] As a result the Commission found that (i) Poss' payments to Colonial were discriminatory because they so greatly exceeded the payments made to competitors under the usual arrangements, and (ii) Colonial should have known the payments were discriminatory because they so far exceeded the amounts allowed on its own purchases from Poss that there could be no realistic possibility for Poss to offer equivalent payments to competitors.

In addition, several representatives of Colonial's competitors testified that they had received no offers of proportionally equal promotional consideration equivalent to that paid by Poss for participation in the Sword in the Stone arrangement. At most this evidence establishes that Associated Grocers received $39 during the same quarter for an advertisement in its weekly order books, along with some free goods, but that no cash payments on the scale made by Poss to Colonial had ever been offered or accepted.

### Colonial's Counterattack

Colonial advances three distinct arguments to justify its contention that the FTC's cease and desist order cannot stand. The first is a Charge of the Light Brigade [10] head-on assault, mounted on the assertion that the findings of discriminatory payments are not supported by substantial evidence. The second is a flanking movement which proceeds on the theory that, even if the payments were not offered to Colonial's competitors on proportionally equal terms, Colonial may not be held responsible because it had neither actual knowledge nor reason to know of their illegality. The last is a strategic retreat necessitated by a concession for the sake of argument: assuming that the payments were discriminatory, and that Colonial was aware

8. Each of these competitors purchased Tradewinds products through Associated Grocers Co-operative, Inc. and would ordinarily have received offers of promotional payments from Associated, who in return would have received them from Tradewinds. However, none of the retail grocers received any direct offers, and Associated received only the 1% advertising allowance and the periodic off-invoice discounts usually offered.

9. The $1700 Colonial received for Poss' brochure advertisement amounted to 45% of Colonial's total purchases of the product advertised (Poss' 24-ounce Brunswick stew) during the first quarter of 1964. The Commission found that Colonial's competitors received promotional consideration amounting to no more than 9% of their purchases.

10. "Was there a man dismay'd?
Not tho' the soldier knew
Some one had blunder'd.
Theirs not to make reply,
Theirs not to reason why,
Theirs but to do and die."
Alfred Lord Tennyson

of facts placing their legality into question, Colonial asserts that it satisfied its duty to make reasonable inquiry by eliciting from each participating supplier a signed statement to the effect that payments made in connection with the Sword in the Stone promotion were being offered to all Colonial competitors on a proportionally equal basis.[11]

### FTC, Not Court, Finds Facts

At this point a preliminary remark is necessary. As is frequently the case in appeals from orders of Federal regulatory commissions, Colonial finds itself in the unenviable position of challenging fact-findings made by an administrative agency whose primary function, by explicit Congressional mandate,[12] is the finding of facts. We have consistently reiterated—and we emphasize the point again now—that when Congress has vested in a Federal agency plenary authority to investigate and regulate particular forms of commercial or economic activity, entrusting it with primary responsibility for the resolution of complex and usually sharply disputed factual issues, appellate court review of the exercise of that authority is confined by the narrow perimeter of the substantial evidence rule.[13] Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative conclusion, even though suggested alternative conclusions may be equally or even more reasonable and persuasive. The findings must

11. Each Colonial division utilized a printed standard form "vendor advertising and promotional arrangement" contract containing the provision, "It is understood that this same agreement is made available by the Vendor [Supplier] on a proportionally equal basis to all dealers in the competitive area who purchase products as herein specified."

12. Section 5(b) of the Federal Trade Commission Act provides, in pertinent part:
"Whenever the Commission shall have reason to believe that [a] person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so combined of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by sections 41–46 and 47–58 of this title, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice." 15 U.S.C.A. § 45(b).

13. Section 5(c) of the Act, 15 U.S.C.A. § 45(c), provides that on appeal "the findings of the Commission as to the facts, if supported by evidence, shall be conclusive." Correctly construed, of course, this means such evidence as is adequate to reasonably support the conclusion reached. Foremost Dairies, Inc. v. F.T.C., 5 Cir., 1965, 348 F.2d 674, 676, cert. denied, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362; 15 U.S.C.A. § 21(c). Assessments of the credibility of the evidence and the inferences to be drawn from it are wholly within the competence of the Commission. FTC v. A. E. Staley Mfg. Co., 1945, 324 U.S. 746, 760, 65 S.Ct. 971, 89 L.Ed. 1338, 1347; F.T.C. v. Pacific States Paper Trade Assn., 1927, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534, 538; Rushing v. F.T.C., 5 Cir., 1963, 320 F.2d 280, 283, cert. denied, 1964, 375 U.S. 986, 84 S.Ct. 519, 11 L.Ed.2d 473; Keele Hair & Scalp Specialists, Inc. v. F.T.C., 5 Cir., 1960, 275 F.2d 18, 21.

stand unless they were wrong, and they cannot be wrong—that is, reversibly wrong—if substantial evidence supports them.[14]

The wisdom of this rule is unassailable. If the corner grocery store—locally owned and competitively supreme within the ambit of the immediate neighborhood —has not yet died out entirely, it is nevertheless well on the way toward extinction. Its successor is the supermarket chain, operating hundreds of stores on a grandiose interstate scale, with thousands of employees, annual sales totaling hundreds of millions of dollars, and the initiative to devise merchandising and marketing techniques of a progressively intricate character.[15] Effective Federal regulation of such commercial giants, in order to preserve competition and thereby promote the public interest as formulated by Congress would be impossible if the FTC's factual determinations are periodically undermined in the courts. Judges are not equipped to explore the esoteric mysteries of the retail grocery business. The necessary expertise, acquired by long experience in the handling of complex problems involving a given activity, is administrative rather than judicial.

To state those premises, under present circumstances, is almost to state

the conclusion. The FTC, following extensive hearings in which both sides presented voluminous testimonial and documentary evidence,[16] determined that Colonial had induced from its suppliers illegal promotional payments which it knew or should have known were not being offered to its competitors on proportionally equal terms. Both direct and circumstantial evidence in the record supports this conclusion. The Commission's findings and order must therefore stand.

### Evidence of Discriminatory Payments

Colonial argues first that the finding of discriminatory payments is not supported by substantial evidence because (i) no evidence excludes the possibility that the Tradewinds payments were not made pursuant to the standing 1% of purchases advertising agreement, (ii) no evidence excludes the possibility that Tradewinds made offers of free goods to Colonial's competitors in lieu of cash payments, (iii) the fact that Poss' payments to Colonial on a percentage of purchases basis were much greater than those received by competitors is not evidence that Poss did not *offer* similar arrangements to those competitors, and (iv) even if such offers were not made, the larger payments were not necessarily

14. Obviously the line of demarcation between factual and legal conclusions in a case such as this will be wavering and uncertain, since the statutory standard ("proportional equality") is open to widely varying individual interpretations. Under such circumstances, the final imprimatur on the application of the law to the facts must come from Judges rather than Commissioners. F.T.C. v. Colgate-Palmolive Co., 1965, 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904, 914. Nevertheless, even when the Commission's findings, are framed in terms of legal conclusions, their presumptive validity is considerable. F.T.C. v. Mary Carter Paint Co., 1965, 382 U.S. 46, 48–49, 86 S.Ct. 219, 15 L.Ed.2d 128, 130, reversing 5 Cir., 1964, 333 F.2d 654. We have recently seen fresh proof of this. Gainesville Utilities Dept. v. Florida Power Corp., 1971, 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74, reversing Florida Power

Corp. v. F.P.C., 5 Cir., 1970, 425 F.2d 1196.

15. Colonial's Sword in the Stone promotion is itself an extravagant example of high-powered supermarket salesmanship, as the Commission's exhibits illustrate. In addition to a variety of cash prizes and merchandise premiums, the game also offered the opportunity to win all-expense-paid trips to Disneyland (CX 10), and Colonial supplied each of its stores with an assortment of game-promoting equipment, including window streamers, posters, cartoon character cut-outs, banners and pennants, game instruction cards, "stick-out" cards for shelf displays, employee lapel ribbons, bumper stickers, and cards to be used for posting winners' pictures near the front door (CX 21).

16. In addition to nearly 2000 pages of testimony, the Hearing Examiner considered more than 130 documentary exhibits submitted by both parties.

discriminatory because the standard is a comparative one, depending upon the type of promotional benefits received.

None of these assertions can withstand serious scrutiny. In the first place, although there was no direct evidence adduced to prove that the Atlanta Division's $2400 payment was not part of the regular 1% allowance—and under the circumstances it is difficult to see what form such proof would have taken—the circumstantial evidence introduced on the issue has a probative value equivalent to Thoreau's trout in the milk. The division's sales invoices reflect total first quarter purchases from Tradewinds of $33,553.80,[17] no single division purchase amounting to more than $8,000 in any one week. For the same period Colonial's billing under the 1% allowance amounted to $181.25.[18] Thus the total first quarter payments to Colonial's Atlanta Division totaled $2581.25 against a 1% allowance on purchases amounting at most to $335.54. We think this fact alone constitutes substantial evidence supporting the FTC's conclusion that the $2400 Sword payment was in addition to, rather than pursuant to, the 1% advertising allowance.[19] "Figures speak and when they do, Courts listen." [20]

17. Colonial argues that there is no evidence that the sales invoices show the total first quarter purchases made by the Atlanta Division. This contention borders on the frivolous, since the invoices were introduced by agreement of counsel following the Commission's request for invoices showing *all* first quarter purchases from Tradewinds. Since we assume that Colonial did not intend to deliberately misrepresent its total purchases by withholding some of the requested invoices, and since Colonial has never suggested that its records are incomplete, the conclusion must be that the Commission's figures are accurate. If they are not, Colonial could have and should have produced evidence of that fact, rather than indulging in untimely hypotheses regarding what might have been. "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. * * * Silence then becomes evidence of the most convincing character." Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610, 620.

18. Since this amount was approximately $150 less than its maximum entitlement under the 1% of purchases allowances, Colonial suggests that the billing covered that portion of the allowance remaining after deduction of the $2400 Sword payment, and that the 1% allowance might have been computed on the basis of an aggregation of purchases from other periods or by other Colonial divisions. This suggestion is positively refuted by Colonial's own officials, who testified that, while diversion of regular advertising allowances to special promotions was sometimes permitted, the consistent practice was to make a notation of that fact on the contract itself so that the accounting department would know how to bill the supplier (App. 27, 69, 72, 173). Not only is such a notation omitted in the Tradewinds Sword contracts (CX 513, 514), but the agreements themselves affirmatively establish a separate and distinct transaction unrelated to the usual allowances. Moreover, Mr. Bazemore, the advertising manager for the Raleigh Division, testified that he was unaware of any practice that permitted Colonial to aggregate purchases from other divisions to increase the allowances in any one division (App. 75–76). And if somehow Colonial did aggregate purchases from other divisions or from other calendar quarters in order to increase the maximum allowance available in the Atlanta Division for the Sword in the Stone promotion, it had the burden either to produce evidence of that fact or to suffer the consequences of an adverse inference drawn from otherwise uncontested evidence. See notes 13 and 17, *supra*.

19. Colonial apparently misapprehends the Commission's reasoning when it argues that only a "conjectural speculation" supports the conclusion. Documentary evidence establishes total first quarter purchases, the maximum allowance payable, the actual allowance paid and the amount paid for the Sword promotion. The only "speculation" involved is that which destroys Colonial's theory by supposing that the $2400 payment was made pursuant to the 1% allowance and then determining the total purchases that would have been required to justify a $2581.25 promotional payment computed on a 1%-of-purchases basis. That amount—$258,125—simply *does not square with the undisputed evidence* establishing actual first quarter

See note 20 on page 742.

Nor is there any substance to Colonial's further speculation—also wholly devoid of any evidentiary support —that the $2400 payment might have been offset by a Tradewinds offer of free goods to Colonial's competitors. Such a supposition is beyond credulity when—in a record of several hundred pages following proceedings which spanned nearly a year—the only facts bearing on the point reveal that the total value of such offers amounted to no more than $35 (CX 521c). Even if Colonial had advanced a viable hypothesis, however, the FTC was nevertheless not compelled to accept it, particularly in the absence of evidence establishing it and in the face of evidence refuting it. See note 13, *supra.*

For similar reasons the finding that Poss' $1700 payment was discriminatory must stand, since Colonial does not really dispute the evidence upon which this finding is based but instead merely asserts that other evidence is more persuasive and thus dictates a different result.

Although Poss' general manager, Mr. Mangleburg, testified that the company's salesmen were under direct orders to proportionalize promotional payments by making equivalent offers to the trade generally, he did not testify that such offers had in fact been made in connection with the Sword in the Stone promotion.[21] On the other hand Mr. Ponder of Associated Grocers testified unequivocally that Poss made no offers of cash promotional consideration during the period in question, that it was ordinarily the policy of Associated to accept such offers when they were made, that if an otherwise acceptable offer had been made it would have been accepted, and that Associated had actually received from Poss no more than a few cases of free goods and three dollars a week for an ad in its order book (App. 162). In addition Mr. Veach of Bi-Lo, Inc., another Colonial competitor, stated that he did not recall any offers of promotional consideration from Poss that would have approximated Poss' payment to Colonial.[22] At this stage, then, the

---

purchases of only $33,553.80. In the absence of any evidence disputing these figures, the FTC was entitled to conclude that additional purchases simply did not take place.

20. Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, 9, cert. denied, 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135.

21. "Q. Now you said a while ago, I believe on direct, that your salesman always offers to the trade in any particular trade area when he makes a special promotion with somebody—promotional agreement with somebody, he makes an offer to the trade generally in that area. Do you know for a fact that this was done on or about the time of the Colonial "Sword in the Stone" promotion as a result of your agreement to participate in it?
A. I feel sure that it was because our salesmen have had that driven home to them and I think a competitor, either at that time or a little later in the year, was running a promotion comparable to it." (App. 118).
Besides failing to establish that proportional offers were actually made, the answer entitled the FTC to conclude that

they were not since the reference to a competitor's comparable promotion indicates that the witness may have mistakenly assumed that such offers were required *only* when a competitor initiated a similar campaign.

22. Colonial suggests that none of this testimony is credible because offers of promotional consideration in the grocery trade are customarily made orally rather than in writing, thereby precluding the possibility of all offers being accurately recalled. Apart from the fact that we do not review assessments of credibility, see note 13, *supra,* this argument logically implies that grocery store promotional arrangements between suppliers and retailers are, as a practical matter, immune from § 2(d) regulation because (i) the FTC cannot establish a violation unless it proves that offers were not made to competitors and (ii) it cannot prove that no offers were made because none of the participants can remember the circumstances clearly enough to provide reliable testimony. Needless to say, the reasoning is specious, the premises faulty, and the conclusion absurd.

evidence reasonably supports the finding that, regardless of what its "established policy" might have been, Poss failed to follow up its Sword payment with offers of proportionally equal payments to all Colonial competitors.

Moreover, the Commission then nailed the lid on the coffin of the discrimination issue with evidence establishing that Colonial either knew or had reason to know that Poss' payments were illegal because they so greatly exceeded the normal proportion of allowances to purchases. Although not conclusive in itself, that evidence strongly reinforces the other testimony regarding the absence of equivalent offers.

### Proportionality: The "Payments Made-Benefits Received" Theory

Finally, Colonial advances the contention that even though Poss may not have followed its payment to Colonial by offering to competitors payments proportionalized on a strict percentage of purchases basis, there can still be no finding of discrimination because Poss realized more valuable promotional benefits from Colonial than it would have received from any of its competitors. In other

words, the argument is that the more effective promotional techniques employed in the Sword in the Stone contest justified payments that were comparatively larger than those made for promotional efforts of less commercial value. Or, to put it still another way, only Colonial had a Sword in the Stone project, so the suppliers could not have offered similar allowances to competitors who were not undertaking a similar promotional scheme.

 Unfortunately the cases cited by Colonial [23] do not justify such an expansive interpretation of § 2(d)'s requirement of "proportional equality." Obviously a multi-million dollar supermarket chain will be capable of providing promotional services of considerably greater utility and sophistication than those of a smaller competitor, and such services will be worth more to the supplier. But the requirements of proportionality are not satisfied merely because the supplier gives the competitors a choice between initiating a promotion comparable in scale to the Sword in the Stone game and foregoing any corresponding promotional consideration whatever.[24] Some minimal effort to pro-

23. F.T.C. v. Simplicity Pattern Co., Inc., 1959, 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079; Lever Bros. Co., 1953, 50 F.T.C. 494. In construing the identical proportionality requirement of § 2 (e), the Supreme Court in *Simplicity Pattern* suggested "the possibility that this tailoring of services and facilities to meet the different needs of two classes of customers" might in fact constitute proportionality. 360 U.S. at 61, n. 4, 79 S.Ct. at 1010, 3 L.Ed.2d at 1084. This was merely a reaffirmance of the principle expressed in *Lever Bros.* that § 2(d) does not "require a seller to pay at the same rate * * * for types of services which are of unequal cost or value. * * * Payments must be made in good faith for services or facilities actually rendered and there should be a fair and reasonable relation between the amount of the payment and the type of service rendered." 50 F.T.C.

at 512. But neither case supports Colonial's broad assertion that a supplier may make promotional payments greatly exceeding the fixed percentage of purchases standard imposed upon other, perhaps smaller, competitors and then justify the excess as non-discriminatory solely on the theory that it *obtained superior advertising benefits.*

24. Poss did not, as Lever Brothers did, 50 F.T.C. at 507, offer other competitors a choice of alternative advertising plans under which equivalent promotional benefits might have been secured. Indeed, the finding is that it did not make any equivalent offers at all (App. 242), but instead negotiated with Colonial for what was clearly a one-of-a-kind promotion that could not have been duplicated and probably not even imitated. Such individual bargains do not represent any meaningful attempt to comply with § 2(d)'s propor-

portionalize in good faith must be made, and while promotional benefits received may enter into the calculation, they cannot obliterate entirely the fact that the fundamental relationship is one of proportionality among *offers*.[25] To hold otherwise would result in widely varying promotional payments in amounts almost directly related to the size and mercantile prowess of the individual payee, a consequence which § 2(d) was enacted to preclude.

The conclusion is thus inevitable that Poss did not simply offer more for promotional activities that provided more, but rather failed altogether to offer Colonial's competitors anything approximating a proportionally equal arrangement. It made some offers of free goods, but these were trifling when compared to the $1700 lump payment made to Colonial. Several competitors testified that no equivalent offer had ever been made. Under these circumstances there is ample evidentiary support for the Commission's conclusion that the Poss payment was discriminatory.

The problem with Colonial's whole line of attack on these factual issues is that it mistakenly assumes that the Commission must affirmatively negate every conceivable adverse inference which can be drawn from the evidence. That is not the law. If substantial evidence reasonably supports the conclusion reached, the fact that alternative conclusions may have remained unexplored is totally irrelevant. We judge only the sufficiency of the proof, not the propriety of the FTC's investigative methods. See Niresk Industries, Inc. v. F.T.C., 7 Cir., 1960, 278 F.2d 337, 343 (concurring opinion), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104.

### Did Colonial Have Reason To Know That The Payments Were Discriminatory?

Given the fact of discrimination, the question now becomes whether substantial evidence supports the Commission's finding that Colonial knew or should have known of it. J. Weingarten, Inc., 1963, 62 F.T.C. 1521, 1525. Clearly it does.

Instances in which the FTC will be able to prove actual knowledge of a § 2(d) violation are likely rare, since the only direct evidence of a state of mind must come from the testimony of the individuals who have broken the law. As a consequence, "although knowledge must be proved, it need not be by direct evidence; circumstantial evidence, permitting the inference that petitioners knew, or in the exercise of normal care would have known, of the disproportionality of the payments is sufficient." American News Co. v. F.T.C., 2 Cir., 1962, 300 F.2d

tionality requirement. See Liggett & Meyers Tobacco Co., 1959, 56 F.T.C. 221, 243; Vanity Fair Paper Mills, Inc. v. F.T.C., 2 Cir., 1962, 311 F.2d 480, 486–487.

25. As the leading commentator on the Robinson-Patman Act has pointed out, the principle announced by the Supreme Court in *Simplicity Pattern* "would allow suppliers, as long as all customers were given *some* benefits of proportional value, to channel their promotional funds into the most fruitful directions—to obtain greater returns from cooperative advertising campaigns while at the same time insuring fair treatment for all competing customers." Likewise, the FTC's *Lever Bros.* decision merely permits

"the supplier to formulate a promotional campaign maximizing the potency of the media of his choice—so long as *some* 'fair and reasonable' equivalent is provided for those competing rivals who could not otherwise participate. Nevertheless, the supplier's program need not ignore the relative desirability of particular promotional media and may scale reimbursement accordingly, thereby ensuring 'proportionality' not only with respect to 'customers' purchases' but also 'their ability and equipment to render or furnish the services to be paid for.'" Rowe, Price Discrimination Under the Robinson-Patman Act 404, 409 (1962). Of course these considerations are largely irrelevant when, as here, no equivalent offers of any kind were ever made to Colonial's competitors.

104, 110, cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64; Grand Union Co. v. F.T.C., 2 Cir., 1962, 300 F.2d 92, 100; Giant Food Inc. v. F.T.C., 1962, 113 U.S.App.D.C. 227, 307 F.2d 184, 187, cert. denied, 1963, 372 U.S. 910, 83 S.Ct. 723, 9 L.Ed.2d 718; cf. Automatic Canteen Co. of America v. F.T.C., 1953, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454.

The Commission's findings with respect to both the Tradewinds and the Poss payments are based on the theory that, by virtue of its own experience with the cooperative advertising agreements and off-invoice and free goods allowances of both suppliers, Colonial must have known that the $2400 and $1700 payments were so grossly disproportionate to the ordinary allowances computed on a percentage of purchases basis that neither supplier was making offers of proportionally equal payments to all competitors. Thus, Tradewinds' Sword in the Stone payment amounted to approximately 7% of Colonial's total first quarter purchases, in addition to whatever it received under the usual off-invoice allowances. Yet it knew that competitors were receiving payments under the cooperative agreement amounting to no more than 1% of purchases, and it must have known that Tradewinds simply could not have afforded to make offers proportional in value to all other dealers, a fact confirmed by the testimony of Mr. Mueller, Colonial's expert on grocery advertising and promotional programs.[26]

The $1700 payment received from Poss should have been even more suspect from Colonial's standpoint, since that amount represented 46% of the first quarter purchases of the product advertised,[27] while Poss' usual promotional allowance of one case of free goods for each ten cases purchased amounted to only 10%, with a few other payments of lesser percentages. From its own experience Colonial had reason to know that its competitors were being short-changed by Poss, and it cannot now reasonably contend that it was unaware of facts that gave more than fair warning.

### The "Clean Bill of Health" Provision

Colonial's final argument is that, conceding it was aware of facts placing it under a duty to inquire about the legality of the payments, it nevertheless satisfied that duty by requiring both Tradewinds and Poss to sign written representations (see note 11, *supra*) that similar payments were being offered to competitors on a proportionally equal basis. We think the FTC justifiably concluded that the inducement of this self-serving declaration was entitled to no evidentiary weight whatever under the circumstances.

In the first place the forms were not signed by Tradewinds until nearly a month after, nor by Poss until more than a month after, the Sword in the Stone promotion began (CX 25, 61). Consequently their ex post facto character limits if not precludes the possibility of their being considered as evidence of precautions taken by Colonial *before* the promotional agreement was reached.

26. Mr. Mueller testified that a supplier "obviously" could not make proportionally equal offers to all competitors if the total payment to any one retailer amounted to 7% of sales during the period in which the promotion was to run (App. 205). Yet that is precisely what happened here.

27. In its brief Colonial strenuously contends that there is no rational justification for computing the percentage of purchases solely upon the basis of one size of one Poss product purchased during one three-month period. But Poss' brochure advertising related only to that product (the 24-ounce size Brunswick stew), and the ad ran only for the first quarter of 1964. Even taking into account purchases of all Poss products during the relevant period, the Sword in the Stone payment still amounted to almost 19% of their value, and even then it is relatively clear that no supplier would have given an advertising allowance on unadvertised products.

Even more significant, however, the requirement that a supplier sign such a representation is simply not sufficient, by itself, to offset actual knowledge of facts strongly suggesting, if not establishing, that despite disclaimers to the contrary the supplier is not offering proportionally equal payments to competitors. A written agreement, which by its nature is to be treated as a substitute for inquiry, cannot take the place of an independent investigation if, as found by the Commission, there are ample grounds for believing that the other party may not be complying with the requirements of the law.[28] And while the exigencies of the trade may make such painstaking verification difficult, the obvious answer—in this case, at least—is that any sort of inquiry would have confirmed what there was already good reason for suspecting. It would surely have confirmed what the facts were, leaving perhaps some uncertainty as to their legal consequences. But on that score no amount of written statements, disclaimers, protestations of clean health, noble purpose or purity of heart made by another could exculpate the recipient from bearing what the law imposes. When the warning signs are so clear, the recipient must either devise some practicable method for allaying its doubts— and thereby satisfying its duty of inquiry—or it must forego entirely the opportunity to solicit a lucrative but highly suspect promotional arrangement. An alternative, of course, is to risk a disastrous engagement with the FTC and, as here, to lose.

The order of the Commission is affirmed and enforced in its entirety.

Affirmed and enforced.

28. Naturally a written representation may be treated by the FTC as having some utility under other circumstances, such as when the factual question of whether the recipient had reason to know of actual discrimination is a very close one. All depends upon the unique state of the evidence in each case. Automatic Canteen Co. of America v. F.T.C., *supra*, 346

U.S. at 80, n. 24, 73 S.Ct. at 1017, 97 L.Ed. at 1467; Utah Pie Co. v. Continental Baking Co., 1967, 386 U.S. 685, 695, n. 10, 87 S.Ct. 1326, 18 L.Ed.2d 406, 415. But when on credited findings that reason to know is undeniably present, reliance upon the supplier's declarations will not suffice.