**NATIONAL ASSOCIATION OF WOMEN'S AND CHILDREN'S APPAREL SALESMEN, INC., a/k/a NAWCAS Guild, etc., et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 71–1880.

United States Court of Appeals, Fifth Circuit.

May 21, 1973.

Simpson, Circuit Judge, filed dissenting opinion.

Raymond R. Dickey, Robert D. Roadman, Washington, D. C., Sherwyn E. Syna, Atlanta, Ga., for petitioners.

Joseph Martin, Jr., Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., for respondent.

Before JOHN R. BROWN, Chief Judge, and BELL and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

We enter the workroom to review the propriety of an FTC cease and desist order which compels the Petitioners, National Association of Women's & Children's Apparel Salesmen (NAWCAS) to refrain from committing certain unfair trade practices within the context of their regional trade shows. Our role is chiefly that of a tailor: we must dart the seam of two interrelated public policies—the antitrust proscription and its labor exemption. The thread which fastens this seam is composed of three independently woven fibers: (i) is NAWCAS a "labor organization" under the cloak of the Norris LaGuardia Act,

29 U.S.C.A. § 104, and Clayton Act §§ 6, 20, 15 U.S.C.A. § 17, 29 U.S.C.A. § 52, special dispensation for labor? (ii) do the challenged activities arise in the context of a bona fide "labor dispute" as that term is used in these statutory provisions? and (iii) has NAWCAS acted only in its labor self-interest—eschewing any combination with non-labor groups? Unless all three questions can be answered affirmatively, NAWCAS is not entitled to don the protective cloak.

■ The FTC, relying heavily on an NLRB holding in a collateral proceeding, answered the first two questions negatively and issued its order.[1] National Association of Women's and Children's Apparel Salesmen, 1971, —— F.T.C. —— [docket no. 8691]. Because we are in agreement on these points, we enforce the order without addressing ourselves to the third question.[2]

### The Wrinkled Cloak

When the National Association of Women's and Children's Apparel Salesmen was formed in 1945, its avowed purpose was to provide a forum for the free exchange of trade information and a force to represent the best interests of ready to wear clothing salesmen.[3] At that time, NAWCAS stitched together 21 local affiliate groups of salesmen.[4] One of the primary activities of these affiliates was the sponsoring of regional trade shows to minimize traveling.

There are approximately ten thousand manufacturers of women's and children's apparel in the United States, mostly centered in and around the New York City area. Although there are

1. Counsel for NAWCAS conceded before the Commission that if his client's activities were not protected by the labor exemption to the antitrust laws, that their conduct was violative of the Federal Trade Commission Act. Thus, there is no basis from which to attack the Commission's order on its intrinsic merits if the labor exemption will not stand up.

2. Basing our holding upon the determination that NAWCAS may not act as a labor organization, we need not determine the extent to which certain component members of NAWCAS might constitute non-labor groups. See generally, United States v. Hutcheson, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; American Federation of Musicians v. Carroll, 1968, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460; Cedar Crest Hats, Inc. v. United Hatters, 5 Cir., 1966, 362 F.2d 322.

3. The objective, aims, and purposes of NAWCAS were set forth in Article III, Section 1 of its constitution.

   The objectives, aims and purposes of this association shall be educational and for the promotion of the best interests of its members; to provide a national association of all organizations or groups composed of salesmen engaged in the wholesale selling of women's or children's wearing apparel or accessories . . . to promote, stimulate and protect the interests and welfare of salesmen in the women's and children's fields and the industry with which they are concerned . . . to cooperate with organizations composed of salesmen in kindred fields whenever practicable and feasible to the end that a strongly organized national voice of salesmen may be achieved . . . to institute and maintain an educational program concerning itself with the welfare and future security of salesmen . . . to create a clearing house for the interchange and dissemination of pertinent information, ideas, plans and facts helpful to members of affiliated organizations . . . to establish and maintain an active employment clearing house . . . to give wholehearted support to measures that are fair, reasonable and equitable to the interests and welfare of salesmen . . . to provide information and guidance, and promote a policy of helpful services to independent retailers, and generally foster a cordial relationship between manufacturers, retailers and salesmen and to represent the members as their bargaining agents and where appropriate to negotiate collective agreements in their behalf.

4. One of these affiliates, Style Exhibitors, Inc. of Chicago is also a named party in the FTC's order and a petitioner herein. The FTC Examiner determined that the advocacy of Style Exhibitors was adequate to represent the other members of its class of affiliates, all of whom had some notice of the pending proceedings before the FTC. There is no challenge to this ruling on appeal.

several industry giants, their share of the market is relatively miniscule—90 per cent of the business going to the smaller manufacturers. Their wares are normally marketed through the efforts of the hired salesmen. Most of these men work on commissions, although the trend among the larger firms is toward compensation by a fixed salary. They also tend to work exclusively for one manufacturer—purportedly to preserve design integrity and prevent "line piracy"—unless their territory is so threadbare that they must represent two or more noncompeting lines to make an adequate living.

The most effective method of marketing apparel has been found to be that of the regional, periodic trade show.[5] Sponsoring these shows is the role of the local affiliate. They are usually held in hotels, auditoriums, or merchandise marts. Long-term advance planning is necessary. The affiliate who sponsors the show rents the necessary facilities, solicits registration from members qualified to exhibit, and provides general logistical support for the registrants. Each show is governed by the rules and regulations of the sponsoring affiliate and violations of the rules may result in a fine or suspension. As noted by the NLRB and FTC, a number of the rules are designed to prevent members from participating in competing shows. Because of the tremendous prestige and economic impact of these shows, participation in them is almost a business necessity.

Many of NAWCAS's tangible goals [6] were union-like. But for the first 11 years its approach was strictly velveteen. Then, at its 1956 convention, NAWCAS adopted the "California Resolution". Under this Resolution NAWCAS decided to exert economic leverage by blacklisting "uncooperative manufacturers" from the affiliates' trade shows. At first the blacklists were confined to those manufacturers who did not put forth a cooperative effort towards resolving disputes with their association-member salesmen. In 1960, however, the economic tool of excluding uncooperative manufacturers from the trade shows was extended to those manufacturers who failed to hire their salesmen under the terms of NAWCAS's standard contract.

It is this refusal to deal which the FTC seeks to collar with its order.[7]

5. Other methods of marketing include direct mail sales, home office showroom sales, regional sales offices in key cities, sales to jobbers, and direct sales to a common buyer/agent for several retailers.

6. The two chief objectives which they sought to obtain via the unfair trade practices under attack were establishment of a binding system of grievance arbitration and industry-wide use of NAWCAS's standard contract of employment for salesmen. Both are certainly legitimate goals of a bargaining representative. They have also established some rather successful programs of insurance, retirement and death benefits.

7. The Commission's order, which is not challenged on its merits in this appeal, requires the Petitioners to cease and desist from the following:

(1) Refusing or threatening to refuse to promote, display, offer to sell, distribute, or sell at any trade show women's and children's apparel or accessories supplied by any manufacturer who is represented by a member of NAWCAS, a member of any affiliate, or person who is otherwise eligible for trade show participation.

(2) Entering into, continuing, cooperating in or carrying out any planned common course of action, understanding, or agreement with any other party for the purpose or with the effect of preventing, hindering, or interfering with a manufacturer from having his merchandise displayed, exhibited, offered for sale or sold in or from any location not actually contracted for and used as space by respondent NAWCAS or by a representative who is a member of NAWCAS, a member of any affiliate, or any person as a part of a NAWCAS trade show participation for the conduct of a trade show sponsored by NAWCAS, its members or affiliates.

(3) Entering into, continuing, cooperating in, or carrying out any

planned common course of action, understanding, or agreement with any other party for the purpose or with the effect of preventing, hindering, or interferring with a manufacturer's efforts to have his mer chandise displayed, exhibited, sold or offered for sale in any space not actually contracted for and used by a representative who is a member of NAWCAS, trade show participation.

(4) Restricting, regulating, or limiting any member of NAWCAS, any member of any affiliate or any person who is otherwise eligible for trade show participation, in the selection of any merchandise that he may wish to display, offer for sale or sell at any trade show or exhibition.

(5) Requiring, whether directly or indirectly any manufacturer of women's and children's apparel or accessories to comply with any demand, term or condition made by NAWCAS or any of its affiliated members as a condition of having the manufacturer's goods exhibited in a NAWCAS affiliated trade show.

(6) Preparing, printing, publishing or otherwise communicating by any method or means any "uncooperative manufacturers list" or similar device with the purpose or effect of discouraging or preventing the merchandise of any particular manufacturer from being exhibited at any affiliate trade show.

(7) Prohibiting or forbidding any member of NAWCAS or of any of its affiliates, from soliciting the representation of any line of merchandise produced by any manufacturer.

(8) Prohibiting or forbidding any member of NAWCAS or of any of its affiliates, from representing any line of merchandise produced by any manufacturer because said member replaced another member as a representative of said manufacturer.

(9) Prohibiting or forbidding the merchandise of any manufacturer from being promoted or displayed, or offered for sale, distribution or sale by any member of NAWCAS or of any of its affiliates, because said member replaced another member as a representative of said manufacturer.

(10) Conditioning the showing by any member of NAWCAS of any mer chandise of any manufacturer at any trade show organized by any affiliate or other NAWCAS group on the execution by said member of a contract with the manufacturer he represents containing terms or conditions established by and acceptable to respondents.

(11) Restricting or limiting any affiliate or NAWCAS group from accepting as a member any person who transfers from another affiliate or otherwise is eligible or qualified to sell merchandise of any manufacturer.

(12) Requiring any affiliate or other NAWCAS group to agree with any other affiliate on dates when or places where merchandise may be displayed or exhibited, offered for sale, or sold, except that nothing shall prevent any affiliate from continuing to utilize the dates at which such affiliate customarily held its shows, or voluntarily agree to show dates.

(13) Denying or granting courtesy or provisional showing of merchandise to any manufacturer unless said manufacturer is first approved by NAWCAS or a NAWCAS affiliate other than the one to which application is being made.

(14) Prohibiting or forbidding any merchandise of any manufacturer represented by a member of NAWCAS or any of its affiliates from being promoted, displayed, exhibited, offered for sale, or sold at any place or any time by said manufacturer, representative, or other representative designated by said manufacturer.

(15) Prohibiting, restricting, or limiting any person or firm engaged in the offering for sale, distribution or sale of women's and children's apparel or accessories from obtaining any room, rooms, or office space at any time in any facility.

(16) Refusing to accept for membership in NAWCAS any individual who is otherwise eligible for membership and is actively and regularly engaged as a salesman or manufacturer who does not have salesmen and who travels a territory or territories himself, of women's and children's wholesale apparel and accessories irrespective of whether such individual was previously denied or excluded from membership.

(17) Refusing to accept as an exhibitor at any trade show any salesman who may also be a manufacturer,

144

## The Ironing Board

The FTC skirted the necessity of ruling directly on the extent of protection afforded to NAWCAS's activities by labor's cloak of antitrust immunity by relying on the opinion of the NLRB in a collateral proceeding, Bambury Fashions, Inc., 1969, —— NLRB —— [Appendix at 146–156], to iron out the wrinkles. The Board held that because of the commercial nature of NAWCAS's trade shows it was disqualified from functioning as a labor organization.

■■  The rationale behind this deference to the determination of the Board, is that labor's cloak of immunity must be lined with the fact that the putative labor organization is—or could be—the bargaining representative for the employees in question. This is so because the antitrust laws yield only insofar as the union pursues legitimate subjects of collective bargaining. Meat Cutter's Union v. Jewel Tea Co., 1965, 381 U.S. 676, 689 and 710, 85 S.Ct. 1596, 1601 and 1614, 14 L.Ed.2d 640, 649 and 661; American Federation of Musicians v. Carroll, 1968, 391 U.S. 99, 88 S. Ct. 1562, 20 L.Ed.2d 460; Hunt v. Crumboch, 1945, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954. If an organization cannot, under any set of circumstances, function as the collective bargaining agent of the employees of a particular employer, that organization may not transgress the employer's rights to unrestrained competition with impunity under the cloth of a labor label. Allen Bradley Co. v. Local Union No. 3, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

■  The authority to determine representational matters under the National Labor Relations Act is vested exclusively with the NLRB. See NLRB v. Cabot Carbon Co., 1959, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175. Because of the immediacy usually attending such determinations, there is no means of securing direct judicial review of the Board's determination—it must be attacked collaterally in the context of an unfair labor practice charge.[8] Boire v. Greyhound Corporation, 1964, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849; Magnesium Casting Co. v. NLRB, 1971, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735; Templeton v. Dixie Color Printing Co., 5 Cir., 1971, 444 F.2d 1064. Given this commitment, under our national labor policy, to the Board's particular expertise of the task of defining what organizations are labor organizations, we hold that it was proper for the FTC to accord dispositive weight to the Board's holding.[9]

---

importer, wholesaler, or jobber, or officers or employees thereof, whose line or lines of women's and children's apparel are not exhibited at that trade show by a member of NAWCAS or a member of any of its affiliates.

(18) Continuing to retain any provision in its constitution, by-laws, code of ethics, or rules and regulations which contravenes or conflicts in any way with any of the above prohibitions.

8. Notwithstanding this canon of labor law, NAWCAS attempted to collaterally challenge the Board's order. Its futile efforts culminated in National Association of Women's & Children's Apparel Salesmen, Inc. v. NLRB, D.C.Cir., 1972, 465 F.2d 662.

9. The FTC phrased its deference in terms of "primary jurisdiction". Actually it is more than that. Although the Board's election procedures may occasionally be overturned by a court reviewing an unfair labor practice proceeding, until that time the Board action is unassailable. Cf. Coca Cola v. FTC, 5 Cir., 1973, 475 F.2d 299; Alabama Gas Corp. v. FTC, 5 Cir., 1973, 476 F.2d 142 [1973]. There is no concurrent jurisdiction in another tribunal which stands in abeyance pending reference to the Board, as in most cases of primary jurisdiction. Cf. J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84; Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486.

We are not unaware of Mr. Justice White's opinion in Jewel Tea declining to stay the proceeding there until a primary jurisdiction reference to the Board could

What the Board actually held in *Bambury Fashions* was that NAWCAS, because of its financial stake in the trade shows themselves, was precluded from acting as a labor organization. Thus, according to the Board, the disqualifying factor "is the latent danger that it may bargain, not for the benefit of unit employees, but for the protection and enhancement of its business interests which are in direct competition with those of the employer at the other side of the bargaining table." *Bambury Fashions, supra* at ——. In essence it washes out to this. An organization purporting to represent the interests of a group of employees may disregard the potential impact of the antitrust laws on their chosen means if the ends to be accomplished are appropriate bargaining subjects for a labor union. But where the organization has a proprietary interest in the means, in and for themselves, it is disqualified from functioning as a labor organization under the protective cloak. "The labor exemption is inapplicable where the union acts not as a union but as an entrepreneur." *Jewel Tea, supra,* 381 U.S. at 733, 85 S.Ct. at 1626, 14 L.Ed.2d at 675 (Goldberg, J.); *Cf.* Los Angeles Meat & Provision Drivers Union, Local 626 v. United States, 1962, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150; Columbia River Packers Association v. Hinton, 1942, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750; Gulf Coast Shrimpers & Oystermans Association v. United States, 5 Cir., 1956, 236 F.2d 658.

Given this disqualification by the Board,[10] the FTC was correct in buttonholing NAWCAS's anticompetitive activities.

Enforced.

SIMPSON, Circuit Judge (dissenting):

I respectfully dissent.

The majority today holds that the Federal Trade Commission properly relied upon the decision of the National Labor Relations Board in a collateral proceeding, Bambury Fashions, 1969, 179 NLRB 447, which also involved NAWCAS. In *Bambury Fashions* the Board concluded that NAWCAS was not qualified under the National Labor Relations Act to act as the statutory bargaining representative for certain traveling salesmen who potentially competed with employers by conducting trade shows. The majority concludes that the Commission could rely on this Board decision to hold that because NAWCAS may not act as a bargaining representative, it is not a "labor organization" entitled to the protection of the labor exemption to the federal antitrust laws. The basic holding of the majority is:

"The rationale behind this [the Commission's] deference to the determination of the Board, is that labor's cloak of immunity must be lined with the fact that the putative labor organization is—or could be—the bargaining representative for the employees in question. This is so because the antitrust laws yield only insofar as the union pursues legitimate subjects of collective bargaining. [citations omitted] If an organization cannot, under any set of circumstances, function as the collective bargaining agent of the employees of a particular employer, that organization may not transgress the employer's right to unrestrained competition with impunity

be made. But he surely did not mean that a Board determination was inconsequential, for he also stated on that same day: "Unquestionably the Board's demarcation of the bounds of the duty to bargain has great relevance to any consideration of the sweep of labor's antitrust immunity," United Mine Workers v. Pennington, 1965, 381 U.S. 657, 665, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626, 633. See also, *Jewel Tea, supra,* 381 U.S. at

710, 85 S.Ct. at 1614, 14 L.Ed.2d at 661 (Opinion of Goldberg, J.).

10. The Board's finding here is bolstered by an independent finding of the FTC Examiner to substantially the same effect. Of course we are powerless to disturb this finding if "the evidence in the record reasonably supports the administrative conclusion." Colonial Stores, Inc. v. FTC, 5 Cir., 1971, 450 F.2d 733, 739.

under the cloth of a labor label." [citations omitted]

Majority opinion at 144.

The Commission's syllogism, which the majority here endorses, is improper because the Board decided only that NAWCAS could not be a bargaining representative. It did not hold that NAWCAS was not a labor organization.

The core of the Board's opinion in *Bambury Fashions* was:

"Finally, notwithstanding the fact that NAWCAS, as found by the Regional Director, satisfies the two part test of the statutory definition of a labor organization, we find that it is disqualified from acting as such because its interest in representing employee salesmen in the industry conflicts substantially with its primary interest in coordinating and strengthening the trade show activities of its affiliates. We agree with the Employers that NAWCAS in its trade show activities in behalf of independent contractor traveling salesmen members is engaged in the business of selling apparel in direct competition with apparel manufacturers." 179 NLRB at 450.

In *Bambury Fashions* the Board applied its rule in Bausch & Lomb Optical Co., 1954, 108 NLRB 1555, that ". . . the Union cannot perform its statutory function as bargaining representative if simultaneously it is an immediate business competitor of the particular employer whose employees it purports to represent." Ibid. at 1562. Clearly then the Board's holding in *Bambury Fashions* was no more than that NAWCAS was disqualified from acting as a bargaining representative, not that NAWCAS was not a labor organization.

The Commission's extension of the Board's position is unwarranted for another reason. While it is true, as the majority states, that a union is exempt from the antitrust laws only insofar as it unilaterally pursues mandatory subjects of collective bargaining—wages, hours and working conditions, American Federation of Musicians v. Carroll, 1968, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460—it does not follow that a union must be the National Labor Relations Act bargaining representative in order to pursue these goals, and hence enjoy the protection of the labor exemption to the antitrust laws. This is true because the umbrella of the antitrust exemption protects labor organizations. A group may be a "labor organization" within the statutory framework of the National Labor Relations Act without being a "bargaining representative" under that Act, as the language of the statute makes clear:

"The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." National Labor Relations Act, Section 2(5); Title 29, U.S.C., Section 152(5).

NLRB v. Cabot Carbon Co., 1959, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175, demonstrates that the National Labor Relations Act concepts of "labor organization" and "bargaining representative" are not coequal. In *Cabot Carbon* the NLRB had ordered the employer to cease and desist from unlawfully dominating certain employee committees, which coexisted with Board certified bargaining representatives at certain of the employer's plants. This Court refused to enforce the Board's order on the grounds that by the 1947 amendments to the Act Congress had not intended to include such committees within the statutory definition of labor organization, and that the term "dealing with employers" in the statutory definition of a labor organization meant in reality "bargaining with employers", and that the committees were not statutory bargaining representatives. The Supreme Court reversed, stating that the statutory term "dealing with em-

ployers" was not to be read as synonymous with the more limited term "bargaining with employers". 360 U.S. at 211, 79 S.Ct. at 1020, 3 L.Ed.2d at 1180. Further the Court noted that Congress had rejected an amendment which would have substituted the term "bargaining collectively" for "dealing with employers" in the statutory definition of a labor organization. 360 U.S. at 211, 79 S.Ct. at 1021, 3 L.Ed.2d at 1181.

Upon this analysis it seems to me apparent that a group of persons may be a "labor organization" under the terms of the National Labor Relations Act without being a statutory bargaining representative under that Act. Furthermore, the " . . . grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work", National Labor Relations Act, Section 2(5); Title 29, U.S.C., Section 152(5), about which a "labor organization" deals with an employer are essentially equivalent to the "wages, hours, and working conditions" which constitute mandatory bargaining subjects. Unilateral labor organization activity concerning these mandatory bargaining subjects is immune from the federal antitrust laws. I conclude that a group which deals with an employer concerning such subjects is immune from the antitrust laws where such dealings are involved, even though that labor organization is not and cannot be the statutory bargaining representative. In short, an organization may pursue legitimate objectives of collective bargaining even though it is not a bargaining representative. Both the Federal Trade Commission and the majority in this case have fallen into the trap of equating qualification to act as a bargaining representative under the National Labor Relations Act with status as a labor organization.

Thus, I think the Commission based its decision below upon improper legal reasoning. A fundamental principle of judicial review of administrative action requires that in order for a reviewing court to sustain agency action the legal grounds upon which the agency acted must be correct. FTC v. Sperry & Hutchinson Co., 1972, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170; SEC v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 686. Because the Commission improperly relied upon the Board's decision in *Bambury Fashions,* supra, this case should be remanded to the Commission so that the Commission will have an opportunity to base its decision upon legally correct principles, including the extent to which certain components of NAWCAS might constitute non-labor groups not protected by the labor exemption to the antitrust laws. See generally, United States v. Hutcheson, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; American Federation of Musicians v. Carroll, supra; Cedar Crest Hats, Inc. v. United Hatters, 5 Cir. 1966, 362 F.2d 322. This latter question, which is crucial to the issue before the Commission, the majority here finds it unnecessary to consider. See majority opinion, footnote 2 at page 141.

For this reason I dissent from the majority opinion.